COMMONWEALTH vs. JASON LOADHOLT.

Hampden. November 5, 2009. - March 31, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Firearms. Name. False Impersonation & Identity Fraud. Constitutional Law,* Voluntariness of statement, Search and seizure, Right to bear arms, Confrontation of witnesses, Harmless error. *Search and Seizure,* Exigent circumstances, Fruits of illegal search, Consent. *Practice, Criminal,* Motion to suppress, Voluntariness of statement, Sentence, Required finding, Confrontation of witnesses, Harmless error. *Evidence,* Voluntariness of statement, Firearm, Ballistician's certificate. *Error, Harmless.*

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made while he was in custody, where the defendant's statement regarding the location of a firearm, made in response to a question posed by a State trooper who did not first give the defendant Miranda warnings, fell within the public safety exception to the Miranda requirement [416-419]; and where statements that the defendant made during a "conversation" with another trooper was not the product of custodial interrogation [419-422].

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence of a firearm and ammunition, where exigent circumstances justified the warrantless search of a closet for the firearm [422], and where the occupant of the apartment in which the defendant was arrested voluntarily consented to the search that led to the discovery of the ammunition [422-423].

This court vacated the criminal defendant's conviction, and related sentence, on one indictment charging unlawful possession of a loaded firearm in violation of G. L. c. 269, § 10 (*n*), where the defendant had not been convicted of violating G. L. c. 269, § 10 (*a*) or (*c*). [423-424]

At a criminal trial, the judge properly denied the defendant's motions for a required finding of not guilty on the charge of furnishing a false name to a law enforcement officer, where the evidence, viewed in the light most favorable to the Commonwealth, permitted a reasonable fact finder to infer that the defendant had held himself out under one name on prior occasions, that law enforcement officials knew him by this name, and that the defendant gave a police officer a different name for the purpose of concealing his criminal record [424-426]; further, the judge's error in failing to instruct the jury that a false name is one that a person has assumed for a dishonest purpose did not materially influence the guilty verdict [426-427].

This court concluded that G. L. c. 269, § 10 (*h*), prohibiting the possession of a firearm or ammunition without a firearm identification card, does not infringe on the right under the Second Amendment to the United States

Constitution to keep and bear arms for defensive purposes, because under current Federal law, the Second Amendment does not apply to the States. [427-429]

At the trial of indictments charging, inter alia, possession of a firearm or ammunition without a firearm identification card and possession of a loaded firearm, the admission in evidence of a ballistics certificate (and a related letter) without accompanying testimony from the analyst who created the certificate, in violation of the defendant's right to confront witnesses against him guaranteed by the Sixth Amendment to the United States Constitution, was not harmless beyond a reasonable doubt with respect to establishing that the weapon in question fit the statutory definition of a firearm; however, with respect to the ammunition, the properly admitted evidence of the bullets themselves, as well as testimony from police officers, provided overwhelming evidence that the bullets met the statutory definition of ammunition. [430-434]

INDICTMENTS found and returned in the Superior Court Department on June 1, 2006.

A pretrial motion to suppress evidence was heard by *Constance M. Sweeney*, J., and the cases were tried before her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard B. Klibaner* for the defendant.

*Dianne M. Dillon*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant, Jason Loadholt, was indicted on three charges of unlawful possession of a firearm or ammunition without a firearm identification card, G. L. c. 269, § 10 (*h*), after having been convicted previously of two violent crimes, G. L. c. 269, § 10G (*b*); one charge of unlawful possession of a loaded firearm, G. L. c. 269, § 10 (*n*); and one charge of furnishing a false name to a law enforcement officer, G. L. c. 268, § 34A. He filed a motion to suppress evidence seized from the apartment in which he was arrested, as well as statements made to police while he was in custody. After an evidentiary hearing, a judge in the Superior Court denied the motion, and the matter proceeded to trial. The trial was bifurcated, such that the portions of the first three indictments that related to the defendant's prior violent crime convictions (the enhanced sentence portions) were not initially submitted to the jury. The defendant moved for required findings of not guilty at the close of the Commonwealth's evidence and again at

the conclusion of all the evidence. The motions were denied. The jury found the defendant guilty on each indictment. He then waived his right to a jury trial on the enhanced sentence portions of the first three indictments and pleaded guilty to so much of each as alleged one prior violent crime.[1]

The defendant appealed, and we transferred the case to this court on our own motion. On appeal, he argues that (1) the judge erred in denying his motion to suppress; (2) he was improperly sentenced pursuant to G. L. c. 269, § 10 (n); (3) the judge erred in denying his motions for a required finding of not guilty on the charge of furnishing a false name to a law enforcement officer and in instructing the jury on that charge; (4) his prosecution for unlawful possession of a firearm and ammunition under G. L. c. 269, § 10 (h), violated his right to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution; and (5) the admission of State police documents violated his right to confrontation as set forth in *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009) (*Melendez-Diaz*). For the reasons that follow, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

1. *Background.* We summarize the facts found by the judge at the hearing on the motion to suppress, which we have supplemented with other uncontested testimony from that hearing.[2] See *Commonwealth* v. *Gomes*, 453 Mass. 506, 507 (2009). We reserve discussion of additional facts presented at trial for consideration in connection with the defendant's trial-related claims.

At approximately 7:45 A.M. on April 25, 2006, State Trooper Michael Sullivan and seven other law enforcement officers

---

[1]On the first three firearm indictments, the defendant was sentenced to concurrent terms of from ten to twelve years in the State prison. On the fourth firearm indictment, charging the violation of G. L. c. 269, § 10 (n), the defendant was sentenced to one year in a house of correction, to run from and after his sentence on the first indictment. On the last indictment, for furnishing a false name to a law enforcement officer, the defendant was sentenced to one year in a house of correction, to run from and after his sentence on the first indictment and concurrently with his sentence on the fourth indictment.

[2]Portions of the motion judge's handwritten findings are challenging to decipher. The Commonwealth and the defendant each have provided this court with typed transcripts of those findings, which are nearly identical. Any differences are minor and do not impact our understanding of the judge's decision.

went to apartment A of 149 Allen Street in Springfield for the purpose of serving three arrest warrants on the defendant. The warrants were in the name of "Antonio Flowers," an alias used by the defendant.[3] One warrant, issued from the Superior Court, was for assault and battery by means of a dangerous weapon (a firearm); the other two warrants, issued from the District Court, were for motor vehicle offenses. Trooper Sullivan and three officers went to the front door of the apartment, two officers positioned themselves at the back door, and two officers remained outside the building.

State Trooper Kevin O'Toole knocked on the apartment door, announced, "Police," and heard agitated noise from inside. A female occupant asked, through the door, what the police wanted. O'Toole responded that they had arrest warrants for the defendant. After several minutes, Lawanda Hill opened the door of the apartment and looked at the warrants. She was holding a small child, appeared very upset and nervous, and denied that anyone else was in the apartment. Trooper O'Toole thought that the defendant was inside based on the voices and other noise that the officers heard through the door when they first arrived, and based on their observation of a pair of men's athletic shoes near the back door. O'Toole attempted to calm Hill, repeated the reason why the officers were there, and again showed her the warrants. In response to a request to enter, Hill told O'Toole that the officers could come in and look for the defendant, but that she wanted to leave the premises. O'Toole requested that she stay in the apartment.

Given the defendant's history with firearms, the officers searched the apartment with their guns drawn. Within a few moments, the defendant was found hiding in the closet of a child's bedroom. After he was removed from the closet, the defendant was placed in handcuffs; Trooper O'Toole frisked him and found a live round of hollow point ammunition in the defendant's left front pants pocket. Trooper Sullivan immediately asked him, "Where's the gun?" At this juncture, the entire apartment had not yet been searched. The defendant said that there was a gun wrapped in a blue shirt in the closet of the master bedroom; Sullivan

---

[3]According to the testimony of Troopers Michael Sullivan and Kevin O'Toole, one of the warrants was for an individual with the name "Jason Loadholt," and two of the warrants were for an individual named "Antonio Flowers."

retrieved a loaded firearm. O'Toole then brought the defendant into the living room area and gave him Miranda warnings, the first and only time such warnings were administered.[4] After he did so, the defendant explained that the gun belonged to him and that Hill had nothing to do with it. Law enforcement officers proceeded to take the defendant to a cruiser for transportation to police headquarters.

Trooper O'Toole then sat down with Hill and informed her that the officers wanted to search the apartment thoroughly for weapons. He further told her that the police believed that the firearm did not belong to her, and that they were concerned about the safety of her child. O'Toole explained to Hill that she did not have to give her consent to a search, and that the police could apply for a search warrant. Hill asked if she could telephone her mother, which she was permitted to do, and Hill's mother came over to the apartment. The two discussed the matter, and thereafter, Hill signed a "consent to search" form. No other weapons were found in the apartment.[5] Hill informed O'Toole that she was the only tenant and that she lived in the apartment with her child.

In her oral findings, the judge stated that the testimony given by three police officers, and particularly by Troopers Sullivan and O'Toole, was consistent and credible. Conversely, she found Hill's testimony completely incredible. The judge further found that, without question, Hill gave the officers specific permission to search her apartment. The judge stated in her written findings that when the officers found the defendant hiding in a closet

---

[4]At the suppression hearing, Trooper O'Toole testified that, prior to giving the defendant his Miranda warnings, the defendant "was having conversation with" the officers. O'Toole testified that, although he could not remember the exact words, the defendant "was basically saying Lawanda [Hill] had nothing to do with it, it's his firearm, things of that nature. He didn't want her to get into any trouble." When answering the prosecutor's inquiry whether the defendant was saying that in response to questions from Trooper O'Toole, the officer replied: "We were talking. He was more or less just explaining these — he was trying to explain the situation to us, and at that point I'm like, 'Listen, hold on a second.' I took him to the other room, and I said, 'I want to read you your rights.' " At that juncture, O'Toole took out his Miranda warnings card and explained to the defendant his rights.

[5]At the suppression hearing, Troopers Sullivan and O'Toole testified that during the search of the apartment, Sullivan found, in a bureau in the master bedroom, a box containing nineteen rounds of hollow point ammunition, which fit the gun that had been located in the closet.

with a bullet in his pocket, the officers were faced with an immediate and serious physical threat to all persons in the apartment. Given that the defendant was wanted for a violent offense and had a history of illegal firearm use, the judge continued, the police acted well within their rights and responsibilities when they demanded to know where the gun was located, even though the defendant had not yet received Miranda warnings. The judge opined that once the defendant informed the officers that there was a gun present, the officers had to seize it immediately, regardless of any consent issues. Finally, the judge found that after the defendant was given Miranda warnings, he was not interrogated; rather, his statement to the officers that Hill was not involved with the gun was a voluntary and spontaneous remark. See note 7, *infra*.

2. *Motion to suppress.* When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error. See *Commonwealth* v. *Gomes*, 453 Mass. 506, 508-509 (2009); *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). We make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). Questions of credibility are the province of the motion judge who had the opportunity to observe the witnesses. See *Commonwealth* v. *Martin*, 447 Mass. 274, 280 (2006).

a. *Statements made to police.* The defendant first contends that his initial interrogation by the police, during which he revealed the location of the firearm, occurred while he was in custody and before he was given Miranda warnings. As such, he continues, the statement should have been suppressed because it was obtained in violation of his rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. In the defendant's view, the "public safety" exception to Miranda warnings articulated in *New York* v. *Quarles*, 467 U.S. 649 (1984) (*Quarles*), is not applicable to the factual circumstances of this case. We disagree.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." In *Miranda* v. *Arizona*, 384 U.S. 436, 460-461, 467-468

(1966) (*Miranda*), the United States Supreme Court extended this Fifth Amendment privilege to individuals subjected to custodial interrogation by the police.[6] Generally speaking, when a defendant is in custody, any statement made by the defendant as a result of police interrogation is inadmissible unless it is preceded by Miranda warnings. See *Commonwealth* v. *Martin*, 444 Mass. 213, 214 (2005); *Commonwealth* v. *Conkey*, 430 Mass. 139, 144 (1999), *S.C.*, 443 Mass. 60 (2004).

However, in *Quarles, supra* at 651, the Supreme Court created a "public safety" exception to the requirement that the police give Miranda warnings before questioning a suspect in custody. The officers in *Quarles*, while in the act of apprehending a suspect, were faced with the immediate necessity of ascertaining the location of a gun that they had every reason to believe the suspect had just removed from his holster and discarded in a supermarket. *Id.* at 652, 657. The Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Accordingly, in such circumstances, the police may ask questions "necessary to secure their own safety or the safety of the public" without giving Miranda warnings. *Id.* at 659. The Supreme Court also stated that "the availability of [the] exception does not depend upon the motivation of the individual officers involved," *id.* at 656, suggesting that, when confronted with a grave and immediate threat, it is immaterial whether an officer's foremost

---

[6]Article 12 of the Massachusetts Declaration of Rights provides that "[n]o subject shall be . . . compelled to accuse, or furnish evidence against himself." The protections afforded Massachusetts citizens under art. 12 and our common law run parallel to, and in some instances exceed, those guaranteed by the Fifth Amendment to the United States Constitution and the Miranda rule. See, e.g., *Commonwealth* v. *Martin*, 444 Mass. 213, 214-215 (2005) (under Fifth Amendment, physical evidence obtained in violation of Miranda principles not required to be excluded from evidence, but under Massachusetts common law, such evidence is presumptively excludable as "fruit" of improper failure to provide Miranda warnings); *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 855-860 (2000) (under Fifth Amendment, defendant need not be informed of attorney's efforts to contact him, but under art. 12, defendant must be so informed); *Commonwealth* v. *Smith*, 412 Mass. 823, 836-837 (1992) (under Fifth Amendment, government can prove voluntariness of incriminating statement by preponderance of evidence, but Massachusetts common law requires proof beyond reasonable doubt).

concern is for the officer's own safety or that of the general public. See *Commonwealth* v. *Dillon D.*, 448 Mass. 793, 796-797 (2007) (juvenile's possession of plastic bag containing over fifty bullets was enough to support inference that gun was nearby and to allow police to invoke public safety exception to requisite Miranda warnings); *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 598 (1996) (objectively reasonable need to protect police from immediate danger associated with weapon excused officer's failure to give Miranda warnings before demanding to know where gun was located).

In considering the protective reach of this "public safety" exception, we stated in *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 66 (1989) (*Bourgeois*), that, because the defendant introduced his own custodial statement during cross-examination of the apprehending officer, "[w]e need not decide whether the rule of the *Quarles* case applies (or would be extended) to a situation in which the safety of police and not of the public generally (as in the *Quarles* case) is threatened." However, we noted in *Bourgeois* that "there is some suggestion in [*Quarles*] that objectively war-ranted concerns for police safety as well as for public safety might also justify not applying the Miranda rule." *Id.* at 66 n.2. See *Quarles*, *supra* at 658-659. Although the factual scenario in *Quarles* pertained to a threat to the general public in a supermarket, the Supreme Court plainly states, rather than merely suggests, that the police may ask questions "necessary to secure *their own safety* or the safety of the public" without giving Miranda warn-ings (emphasis added). *Id.* at 659. In the heat of a potentially dangerous situation involving a firearm, the police should not be required to gamble with their own personal safety or the safety of members of the general public. See *Commonwealth* v. *Kitchings*, *supra*. See also *Quarles*, *supra* at 658 n.7 (we should not be "penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public").

In a similar vein, although *Quarles* specifically concerned the location of a firearm in a supermarket, the Court did not state that the protection of public safety can only occur in a public area, and our State jurisprudence has not so confined this excep-tion to the Miranda rule. "[A]lthough the hiding of a gun in a supermarket or other public area may create a higher potential

for danger to a member of the public, the presence of a loaded gun in or about a private residence also may present a substantial threat to a number of persons including an arresting officer." *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. 271, 275 (1999) ("public safety" exception to Miranda requirement permitted officer to ask juvenile about possible location of gun in home). See *Commonwealth* v. *Guthrie G.*, 66 Mass. App. Ct. 414, 416-417 (2006), *S.C.*, 449 Mass. 1028 (2007) (same).

Here, we conclude that the defendant's pre-Miranda statement to the police that a gun was located in the closet of the master bedroom fell within the "public safety" exception to the Miranda requirement. The Commonwealth acknowledges that as soon as the defendant was removed from his hiding place, he was placed in the custody of arresting officers. When Trooper O'Toole then found a live round of hollow point ammunition in the defendant's pants pocket, he was faced with an imminent threat to Hill and her child and to the other officers in the apartment. The police knew that the defendant had a history with firearms. Troopers Sullivan and O'Toole, whom the judge found to be credible, testified that, at the time the bullet was found, the entire apartment had not yet been cleared, so the officers did not know if other individuals were present. Furthermore, Sullivan testified that when he was with the defendant in the child's bedroom, he did not know where Hill was located. The fact that the defendant had been placed in handcuffs did not dissipate the potential danger. See *Quarles, supra* at 652, 657 (gun presented public danger even where defendant had been handcuffed because accomplice might make use of it or bystander might later come upon it); *United States* v. *Newton*, 369 F.3d 659, 678 (2d Cir.), cert. denied, 543 U.S. 947 (2004) (even where defendant handcuffed, unlocated gun presented deadly risk to everyone on premises). In these circumstances, Trooper Sullivan reasonably could conclude that there was an immediate need to question the defendant about the presence of a firearm that outweighed the administration of Miranda warnings. The admission in evidence of the defendant's statement about the location of the gun did not constitute a violation of the defendant's rights under the Fifth Amendment or art. 12.

We next consider the defendant's pre-Miranda statement to

the police that he, not Hill, was the owner of the firearm. The defendant contends that he admitted ownership of the gun during a "conversation" with Trooper O'Toole that, in the defendant's view, was the functional equivalent of a custodial interrogation. See note 4, *supra*. As such, the defendant continues, the statement should have been suppressed. We disagree.

"The procedural safeguards of *Miranda* are required not where a suspect is merely in police custody, but rather where a suspect is subjected to custodial interrogation." *Commonwealth* v. *Torres*, 424 Mass. 792, 796 (1997), citing *Rhode Island* v. *Innis*, 446 U.S. 291, 300 (1980). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995), quoting *Miranda*, *supra* at 444. For Miranda purposes, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself," and consists of "express questioning or its functional equivalent." *Commonwealth* v. *Torres*, *supra* at 796-797, quoting *Rhode Island* v. *Innis*, *supra* at 300-301. See *Commonwealth* v. *Sheriff*, 425 Mass. 186, 197 (1997). The term "functional equivalent" encompasses "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth* v. *Torres*, *supra* at 797, quoting *Rhode Island* v. *Innis*, *supra* at 301. "The 'functional equivalence' test does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." *Commonwealth* v. *Braley*, 449 Mass. 316, 324 (2007), quoting *Commonwealth* v. *Torres*, *supra*.

If a statement is spontaneous and unprovoked, or is volunteered by a defendant without improper probing questioning, then it is not the product of custodial interrogation. See *Commonwealth* v. *Koumaris*, 440 Mass. 405, 408-410 (2003) (confessions to correction officers not product of custodial interrogation where defendant initiated interactions to "get something off his conscience"); *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996) (statements made by defendant during fingerprinting that he handled murder weapon not product of custodial interrogation);

*Commonwealth* v. *Lanoue*, 392 Mass. 583, 588 (1984), *S.C.*, 400 Mass. 1007 (1987), and 409 Mass. 1 (1990) (defendant's spontaneous, inculpatory statement properly admissible based on judge's assessment of witnesses' credibility); *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 644-645 (2002) (statements made to officers during conversation begun by defendant that were not coerced and did not result from trickery were not product of interrogation or its functional equivalent). "Miranda safeguards were not intended to prevent a defendant from volunteering incriminating information." *Commonwealth* v. *Byrd*, 52 Mass. App. Ct. 642, 649 (2001). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda, supra* at 478.

We conclude that the defendant's statement that he was the owner of the firearm was not the product of custodial interrogation or its functional equivalent, and, therefore, suppression was not required. Trooper O'Toole testified that, after telling the officers where the gun was located, the defendant continued to have a conversation with the police while he was being escorted to the living room. According to O'Toole, the defendant was "more or less just explaining" the situation — that Hill had nothing to do with the firearm, that it was his gun, and that he did not want Hill to get into any trouble. Contrary to the defendant's contention, the testimony of O'Toole, which the judge found to be wholly credible, did not support a conclusion that the defendant's statement about ownership of the gun resulted from police questioning, or that the officers, through their words or actions, had been trying to elicit incriminating information. The defendant's statement was admissible in evidence.[7] Given this determination, the defendant's repetition of his statement about ownership of the gun, made after receiving Miranda warnings, was not "tainted"

[7]In her findings, the judge did not mention specifically the "conversation" between the defendant and Trooper O'Toole that occurred between the time the gun was seized and the defendant received the Miranda warnings. Instead, the judge found that *after* the defendant was advised of his Miranda rights, he was not questioned. She further found that the defendant's statement to the officers that Hill had nothing to do with the gun was a voluntary and spontaneous remark, not the product of interrogation. Given that the testimony supports the judge's conclusion that the defendant's statement was voluntary and spontaneous, the judge's recollection of the exact timing of the Miranda warnings is immaterial.

and, therefore, inadmissible. See *Commonwealth* v. *Torres, supra* at 799 (statement taken in violation of *Miranda* presumptively taints any subsequent confession).

b. *Physical evidence in apartment.* The defendant asserts that the officers' warrantless search for a firearm in Hill's apartment violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. In light of the defendant's statement to the police that a gun was located in the closet of the master bedroom, properly admissible under the "public safety" exception to the Miranda requirement, exigent circumstances justified a warrantless search of that closet.

To support such a search, "the Commonwealth must demonstrate that the police had probable cause and were faced with exigent circumstances such as danger to their lives, danger to the lives of others, or the destruction of evidence, such that it would be impracticable to obtain a warrant." *Commonwealth* v. *Moore,* 54 Mass. App. Ct. 334, 338 (2002). See *Commonwealth* v. *Forde,* 367 Mass. 798, 800 (1975). The existence of an exigency depends on an evaluation of all the circumstances as they appeared to the police at the time of the search and seizure. See *Commonwealth* v. *Hall,* 366 Mass. 790, 801-803 (1975). Here, Troopers Sullivan and O'Toole both testified that when the defendant told them about the location of the gun, the second bedroom had not yet been cleared, so the officers did not know if another individual was hiding in the closet with the firearm. The officers were immediately faced with a potential threat to the lives of everyone in the apartment. Moreover, the search did not exceed the scope justified by the exigency. See *Commonwealth* v. *Tam Bui,* 419 Mass. 392, 395-396, cert. denied, 516 U.S. 861 (1995) (seizure of weapon permissible where search was limited in scope and occurred before suspicion of danger was dispelled). In these circumstances, there was no violation of the defendant's rights under the Fourth Amendment or art. 14.

The defendant also contends that the judge should have suppressed the box of ammunition that the officers found in a bureau located in the master bedroom. He asserts that his pre-Miranda disclosure of the location of the firearm was the impetus for Hill's subsequent consent to the search of her apartment, which, in turn, led to the discovery of the ammunition. In the

defendant's view, the ammunition constituted inadmissible fruit of his unlawful interrogation. We disagree.

Given our conclusion that there was no violation of the defendant's Miranda rights, the ammunition did not constitute "fruit of the poisonous tree." See *Commonwealth* v. *Martin,* 444 Mass. 213, 214-215 (2005). Furthermore, the judge properly found that Hill, who occupied the apartment with her child, freely and voluntarily consented to the search when, on learning about the presence of the firearm, and then reviewing the search warrant waiver form with Trooper O'Toole, and after discussing the matter with her mother, she signed a "consent to search" form. See *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 222-223 (1973) (warrantless search permissible where undertaken with free and voluntary consent of person possessing ability and apparent authority to give or withhold consent); *Commonwealth* v. *Rogers,* 444 Mass. 234, 236-237 (2005). See generally J.A. Grasso & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 11-1 (2009-2010). The precise reasons for Hill's consent are speculative and immaterial. The ammunition was admissible.

3. *Sentence pursuant to G. L. c. 269, § 10 (n).* The defendant next contends that he was improperly sentenced under G. L. c. 269, § 10 (*n*), because he was not convicted of violating G. L. c. 269, § 10 (*a*) or (*c*). On appeal, the Commonwealth agrees with the defendant's claim, as do we.

General Laws c. 269, § 10 (*n*), states that "[w]hoever violates paragraph (*a*) or paragraph (*c*), by means of a loaded firearm, . . . shall be further punished by imprisonment in the house of correction for not more than 2 1/2 years, which sentence shall begin from and after the expiration of the sentence for the violation of paragraph (*a*) or paragraph (*c*)." For his conviction on one indictment charging unlawful possession of a loaded firearm, G. L. c. 269, § 10 (*n*), the defendant was sentenced to serve one year in a house of correction, to run from and after his sentence on the first indictment charging violation of G. L. c. 269, § 10 (*h*) (unlawful possession of firearm or ammunition without a firearm identification card). See note 1, *supra.* Defense counsel objected to the imposition of such sentence on the ground that the defendant had not been charged or convicted under § 10 (*a*) or (*c*). The judge deemed the objection untimely. The Commonwealth now agrees with the defendant that in order

properly to convict the defendant under § 10 (n), he first must be charged pursuant to § 10 (a) or (c). That did not occur here, and as such, the defendant's sentence pursuant to § 10 (n) was unlawful. Accordingly, the defendant's conviction, and related sentence, on one indictment charging unlawful possession of a loaded firearm in violation of G. L. c. 269, § 10 (n), is vacated.[8]

4. *Motions for required finding of not guilty.* The defendant asserts that the judge erred in denying his motions for a required finding of not guilty on the charge of furnishing a false name to a law enforcement officer, in violation of G. L. c. 268, § 34A. In the defendant's view, the Commonwealth's evidence was insufficient to allow the jury to find, beyond a reasonable doubt, that he gave a false name to the police after his arrest. More specifically, the defendant contends that there was no evidence that he once presented himself to police as a particular individual, and then on April 25, 2006, presented himself to Officer Robert Bohl, the booking officer, as a different individual, without disclosing his prior use of another name.[9] We disagree.

When reviewing a judge's denial of a motion for a required finding of not guilty, we assess the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). To meet this standard, the Commonwealth may rely on reasonable inferences drawn from circumstantial evidence. See *Commonwealth* v. *Arroyo*, 442 Mass. 135, 140 (2004). When evaluating the sufficiency of the evidence, we resolve all credibility issues in favor of the Commonwealth. See *Commonwealth* v. *Platt*, 440 Mass. 396, 401 (2003). "If the evidence lends itself to several conflicting interpretations, it is the province of the jury to resolve the discrepancy and 'determine where the truth lies.' " *Id.*, quoting *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992).

---

[8]Because the defendant's sentence pursuant to G. L. c. 269, § 10 (n), did not increase the amount of time that he would spend in a house of correction, see note 1, *supra*, we need not remand this matter for resentencing. Contrast *Commonwealth* v. *Talbot*, 444 Mass. 586, 597-598 (2005).

[9]The defendant has not challenged the sufficiency of the evidence as to the fact that Officer Robert Bohl was a law enforcement officer, or that the defendant was under arrest when he identified himself to Bohl as "Antonio Flowers."

General Laws c. 268, § 34A, provides, in relevant part: "Whoever knowingly and willfully furnishes a false name . . . to a law enforcement officer or law enforcement official following an arrest shall be punished . . . ." In *Commonwealth* v. *Clark*, 446 Mass. 620, 626 (2006), we stated that, for purposes of § 34A, "a false name is one that a person has assumed for a dishonest purpose." We further opined that, "[i]n the context of the statute, dishonest purposes include, without limitation, concealing one's criminal record for purposes of being charged (avoidance of multiple offender status), concealing one's criminal record for purposes of bail, concealing one's identity to avoid answering to an outstanding warrant, or creating a new identity with the intent to default and avoid prosecution." *Id.*

Here, the Commonwealth presented the testimony of Trooper O'Toole, who stated that he and other officers went to apartment A of 149 Allen Street to "[a]ttempt to arrest Jason Loadholt." See note 3, *supra*. After the defendant was taken into custody, O'Toole testified that he was involved in the booking process at the police station. He became aware that the defendant was using the name "Antonio Flowers" when, as he was entering booking information into the computer system, he noticed that preliminary information from the scene had been entered under the name "Antonio Flowers." O'Toole testified that he performed an investigation as to the defendant's identity, and he concluded that the defendant's true name was "Jason Loadholt." During this investigation, O'Toole continued, he was able to compare a photograph of "Jason Loadholt," which was included in records under the name of "Jason Loadholt," with the defendant, as he appeared to the officers on April 25, 2006, and they were the same person. Moreover, the biographical information set forth in the "Jason Loadholt" records matched the defendant. O'Toole stated that the records he reviewed under the name "Jason Loadholt" also included the name "Antonio Flowers."

Officer Bohl testified that after the defendant was brought out of 149 Allen Street, following his arrest, he was placed in the back seat of Bohl's cruiser, and Bohl started the booking process on his computer. Bohl stated that when he asked the defendant for his name, he replied, "Antonio Flowers." He further testified that when he subsequently spoke with Trooper O'Toole about the defendant's identity, O'Toole informed him that the

defendant's name was "Jason Loadholt." There was no testimony that the defendant ever told Bohl that, on other occasions, he had used a different name.

When viewed in the light most favorable to the Commonwealth, a reasonable fact finder could infer that the defendant held himself out as "Jason Loadholt" on prior occasions, that law enforcement officials knew him by this name, and that the defendant gave Bohl the name "Antonio Flowers" for the dishonest purpose of concealing his criminal record. See *Commonwealth* v. *Clark, supra* at 628 (defendant's use of one name without disclosing prior use of second name is consistent with intent to conceal earlier criminal history under second name). The Commonwealth's case did not deteriorate after the defense presented its evidence. See *Commonwealth* v. *Basch,* 386 Mass. 620, 622 n.2 (1982); *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 n.1 (1976). To the contrary, the Commonwealth's case was bolstered when, on direct examination, the defendant was asked by counsel to introduce himself to the jury, and the defendant identified himself as "Jason Loadholt." Further, when asked if, during the booking procedure, he gave the officers the name "Antonio Flowers," the defendant responded, "I can't recall. They already called me Jason Loadholt. *They already knew who I was*" (emphasis added). The jury could conclude, beyond a reasonable doubt, that the defendant violated G. L. c. 268, § 34A, by telling Officer Bohl during the booking procedure that his name was "Antonio Flowers." Contrary to the defendant's contention, there was no violation of his Federal due process rights because the Commonwealth presented sufficient evidence on each element of the crime charged. Contrast *Commonwealth* v. *Salemme,* 395 Mass. 594, 602 (1985). Accordingly, his motions for a required finding of not guilty were properly denied.

The defendant further contends that the judge's failure to instruct the jury on what constitutes a "false" name created a substantial risk of a miscarriage of justice. He asserts that the judge's brief instruction on the elements of a violation of G. L. c. 268, § 34A, did not inform the jury that a false name was one adopted for a dishonest purpose, that the defendant had a right to change his name, or that he had the right to use more than one name. With proper instructions, the defendant continues, the jury might have found that the name he gave to Officer Bohl was not "false"

within the meaning of the statute because, in the defendant's view, the evidence did not conclusively establish that it was given for a dishonest purpose. The defendant also points out that the judge ignored the recommended jury instruction set forth in *Commonwealth* v. *Clark, supra* at 630-631 (Appendix).

As the defendant recognizes, where he did not object to the judge's instruction, we review the alleged error to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999). It is well established that judges are not required to deliver their instructions in any particular words so long as the instructions adequately explain the pertinent legal concepts. See *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995); *Commonwealth* v. *Sinnott*, 399 Mass. 863, 878 (1987).

The instruction set forth in the Appendix to *Commonwealth* v. *Clark, supra*, with regard to a prosecution under G. L. c. 268, § 34A, is one that a judge *may* give — it is not mandatory. Here, the judge instructed the jury that, in order to find the defendant guilty of violating § 34A, they must find beyond a reasonable doubt that he (1) knowingly and wilfully (2) gave a false name (3) to a law enforcement officer (4) following an arrest. We agree with the defendant that the judge erred in failing to instruct the jury that "a false name is one that a person has assumed for a dishonest purpose." *Commonwealth* v. *Clark, supra* at 626, 630 (Appendix). As a consequence, the judge did not properly set forth each essential element of the offense charged. Nonetheless, as we have previously discussed, the evidence amply established that the defendant gave the name "Antonio Flowers" to Officer Bohl after his arrest for the dishonest purpose of concealing his criminal record. We are persuaded that the judge's erroneous instruction did not materially influence the guilty verdict. See *Commonwealth* v. *Alphas, supra.* The error did not create a substantial risk of a miscarriage of justice.

5. *Second Amendment right to keep and bear arms.* The defendant contends that his prosecution for unlawful possession of a firearm and ammunition violated his right to keep and bear arms as guaranteed by the Second Amendment. More particularly, he argues that G. L. c. 269, § 10 (*h*) (1), which prohibits possession of a firearm or ammunition without having first obtained

a firearm identification card as provided under G. L. c. 140, § 129C, infringes on a fundamental Second Amendment right, that this statutory provision is subject to strict scrutiny, and that there is no compelling State interest that would justify such an infringement. In the defendant's view, the Second Amendment is applicable to the States through the Fourteenth Amendment to the United States Constitution, similar to other rights "necessary to an Anglo-American regime of ordered liberty." *Duncan* v. *Louisiana*, 391 U.S. 145, 149-150 & n.14 (1968) (right to jury trial guaranteed by Sixth Amendment to United States Constitution is protected from State action by Fourteenth Amendment). Based on current Federal law, we disagree with the defendant's argument.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Recently, in *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2787-2788 (2008) (*Heller*), the United States Supreme Court considered whether a District of Columbia prohibition on the possession of usable handguns in the home violated the Second Amendment. Based on both textual and historical analyses, the Court concluded that the Second Amendment guarantees an individual right to keep and bear arms for defensive purposes. See *id.* at 2797, 2799, 2811, 2816.

As relevant to the present case, the Court in *Heller* pointed out that in *United States* v. *Cruikshank*, 92 U.S. 542 (1875) (*Cruikshank*), it had held that "the Second Amendment does not by its own force apply to anyone other than the Federal Government." *Heller, supra* at 2812. In *Cruikshank, supra* at 553, the Supreme Court stated that the Second Amendment "means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government . . . ." In *Heller*, when considering whether any of its precedents foreclosed the conclusion it had reached about the meaning of the Second Amendment, the Supreme Court stated that its decisions in *Presser* v. *Illinois*, 116 U.S. 252, 265 (1886), and *Miller* v. *Texas*, 153 U.S. 535, 538 (1894), had "reaffirmed that the Second Amendment applies only to the Federal Government."[10] *Heller, supra* at 2813 n.23. See *National*

_____

[10]Because *United States* v. *Cruikshank*, 92 U.S. 542 (1875); *Presser* v.

*Rifle Ass'n* v. *Chicago*, 567 F.3d 856, 857 (7th Cir.), cert. granted, 130 S. Ct. 48 (2009) (lawsuits dismissed against municipalities that banned possession of most handguns because Second Amendment not applicable to States); *Maloney* v. *Cuomo*, 554 F.3d 56, 58 (2d Cir. 2009) (per curiam) (it is settled law that Second Amendment only applies to limitations Federal government seeks to impose on individual right to keep and bear arms); *State* v. *Turnbull*, 766 N.W.2d 78, 80 (Minn. Ct. App. 2009) (Second Amendment not incorporated in due process clause and therefore not enforceable against States); *Crespo* v. *Crespo*, 408 N.J. Super. 25, 41 (App. Div. 2009), aff'd, 201 N.J. 207 (2010) (in revamping scope of Second Amendment, *Heller* court did not alter view that Second Amendment poses no limits on States). See also *Commonwealth* v. *Davis*, 369 Mass. 886, 890 (1976) (Second Amendment irrelevant to case brought under State law); *Bach* v. *Pataki*, 408 F.3d 75, 84 (2d Cir. 2005), cert. denied, 546 U.S. 1174 (2006) (Second Amendment right to keep and bear arms only limits Federal, not State, legislative efforts). Accordingly, the defendant's claim here that G. L. c. 269, § 10 (*h*) (1), infringes on his right to keep and bear arms as protected by the Second Amendment must fail. See generally *Commonwealth* v. *Depina*, *ante* 238, 251-252 (2010); *Commonwealth* v. *Runyan*, *ante* 230, 232-235 (2010). Under *Cruikshank*, the Second Amendment imposes no limitations on the ability of the Massachusetts Legislature to regulate, by statute, the possession of firearms and ammunition.[11]

---

*Illinois*, 116 U.S. 252 (1886); and *Miller* v. *Texas*, 153 U.S. 535 (1894), all preceded the development of the Supreme Court's approach of "selective incorporation" of some provisions of the Bill of Rights into the Fourteenth Amendment to the United States Constitution, their reasoning may be considered outdated. Nonetheless, these cases are the law of the land until the Supreme Court decides otherwise, and we are bound by them. See *State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997) (it is solely prerogative of Supreme Court to overrule its precedents); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").

[11]Article 17 of the Massachusetts Declaration of Rights provides: "The people have a right to keep and to bear arms for the common defence. And as, in time of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it." In *Commonwealth* v. *Davis*, 369 Mass. 886, 888 (1976), we concluded that

6. *Admission of ballistics certificate under* Melendez-Diaz.[12]
The defendant next contends that the admission of a ballistics
certificate, and related letter, to prove that the items seized from
Lawanda Hill's apartment were a firearm and ammunition as
defined in G. L. c. 140, § 121, violated his right to confronta-
tion as guaranteed by the Sixth and Fourteenth Amendments to
the United States Constitution, and as explained in *Crawford* v.
*Washington*, 541 U.S. 36, 68-69 (2004). In the defendant's
view, his failure to object to the admission of such documents
should not preclude review of his claim because, in light of our
decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005)
(*Verde*), such an objection would have been futile. Moreover,
the defendant continues, the Commonwealth has not established
that the erroneous admission of these documents was harmless
beyond a reasonable doubt. We agree with respect to the firearm,
but not as to the ammunition.

As previously discussed, the defendant was convicted, among
other offenses, of three charges of unlawful possession of a firearm
or ammunition in violation of G. L. c. 269, § 10 (*h*). These crimes
required the Commonwealth to prove that the weapon at issue
was a "[f]irearm" and the bullets were "[a]mmunition" as defined
in G. L. c. 140, § 121.[13] The Commonwealth's burden to prove
that a weapon is a "firearm" in the statutory sense is not a heavy

G. L. c. 269, § 10, did not violate art. 17 because art. 17 was intended to
provide for the common defense and not to guarantee an individual right to
keep and bear arms. This court further stated that the statute was "part of a
large regulatory scheme to promote the public safety, and there is nothing to
suggest that, even in early times, due regulation of possession or carrying of
firearms, short of some sweeping prohibition, would have been thought to be an
improper curtailment of individual liberty or to undercut the militia system.
Very generally it has been held that such regulation is compatible with State
constitutional provisions on the subject of the right to bear arms." (Footnotes
omitted.) *Id.* at 888-889. See *Commonwealth* v. *Murphy*, 166 Mass. 171, 172
(1896) (notwithstanding art. 17, it is within police powers of Legislature to
regulate bearing of arms).

[12]The trial in the present case was held over two days in February, 2007. As
such, it occurred after our decision in *Commonwealth* v. *Verde*, 444 Mass. 279
(2005), but before the United States Supreme Court granted certiorari in
*Melendez-Diaz* v. *Massachusetts*, 552 U.S. 1256 (2008), on March 17, 2008.

[13]General Laws c. 140, § 121, defines a "[f]irearm" as "a pistol, revolver or
other weapon of any description, loaded or unloaded, from which a shot or bul-
let can be discharged and of which the length of the barrel or barrels is less than
16 inches or 18 inches in the case of a shotgun as originally manufactured."
The term "[a]mmunition" is defined as "cartridges or cartridge cases, primers

one. See *Commonwealth* v. *Nieves*, 43 Mass. App. Ct. 1, 2 (1997). "It requires only that the Commonwealth present *some* competent evidence from which the jury reasonably can draw inferences that the weapon will fire," *id.*, and that it is under a certain length. See G. L. c. 140, § 121 (definition of "[f]irearm"). With respect to "ammunition," there is no requirement of current functionality. The Commonwealth need not prove that "particular ammunition is capable of being fired"; it only must show that "the putative ammunition is designed for that purpose." *Commonwealth* v. *Mendes*, 44 Mass. App. Ct. 903, 904 (1997). See G. L. c. 140, § 121 (definition of "[a]mmunition").

At trial, the Commonwealth relied, in significant part, on G. L. c. 140, § 121A, to satisfy its burden of proof. General Laws c. 140, § 121A, states that a "certificate by a ballistics expert . . . shall be prima facie evidence of his findings as to whether or not the item furnished is a firearm . . . or ammunition" within the statutory meanings of those terms. Here, the ballistics certificate stated that Trooper John S. Schrijn, a duly qualified ballistics expert, examined one Bryco .380 caliber semiautomatic pistol, a six-round magazine, and twenty-three .380 caliber live cartridges. Based on his observations, tests, and experience, these items were a "[f]irearm" and "[a]mmunition" as described in G. L. c. 140, § 121. A related letter stated that the weapon's barrel was two and three-quarters inches long, and that the weapon was test-fired with no malfunctions.[14] Trooper Schrijn was not called to testify at trial.

The defendant did not object to the admission of the ballistics certificate and related letter. In light of our decision in *Verde*, *supra* at 282-285, which the judge was required to follow, an objection was not required because it would have been futile. See *Commonwealth* v. *Vasquez*, *ante* 350, 356-357 (2010). Cf. *Commonwealth* v. *Connolly*, 454 Mass. 808, 830 (2009) (arguably, defendant could not reasonably have been expected to assert at trial constitutional proposition that court in *Verde* had

(igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun." *Id.*

[14]This letter from Trooper John F. Crane of the State police to Captain William Noonan of the Springfield police department, dated August 2, 2006, did not satisfy the requirements of G. L. c. 140, § 121A. As such, it should not have been admitted in evidence.

recently rejected). Moreover, the defendant had no way of knowing that the legal precedent articulated in *Verde* would soon be overruled.

As it turned out, during the pendency of the present appeal, the United States Supreme Court decided in *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2531-2532 (2009), that certificates of forensic analysis are "affidavits" that fall within the core class of testimonial statements covered by the confrontation clause, and that such statements are inadmissible against a defendant unless the analyst appears at trial or, if the analyst is unavailable, the defendant had a prior opportunity for cross-examination. The admission of such certificates in the absence of the analyst's testimony at trial or a prior opportunity for cross-examination is a violation of a defendant's Sixth Amendment right to confront the witnesses against him. *Id.* at 2532. Here, because the Commonwealth did not present the testimony of Trooper Schrijn at trial, the admission of the ballistics certificate, and related letter, violated the defendant's right to confrontation. See note 14, *supra*. Given our conclusion that an objection to the admission of these documents would have been futile under *Verde*, we review the error to determine whether it was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vasquez*, *supra* at 360.

Under this standard, it is the Commonwealth's burden "to show that the wrongfully admitted evidence did not contribute to the verdicts." *Commonwealth* v. *Charros*, 443 Mass. 752, 765, cert. denied, 546 U.S. 870 (2005). See *Sullivan* v. *Louisiana*, 508 U.S. 275, 279 (1993) (harmless error inquiry looks to whether guilty verdict rendered at trial "was surely unattributable to the error"); *Commonwealth* v. *Diaz*, 453 Mass. 266, 278-279 (2009) (error harmless beyond reasonable doubt where it did not influence jury, or had only very slight effect). In *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), we set forth several factors, neither exclusive nor exhaustive, for assessing whether an error is harmless beyond a reasonable doubt: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). See *Commonwealth* v. *Rosario*, 430 Mass. 505, 511-512 & n.6

(1999); *Commonwealth* v. *Waite*, 422 Mass. 792, 801 n.9 (1996). We turn now to consideration of the defendant's theory of the case, the evidence, and any references to the ballistics certificate.

The theory of the defendant's case was that neither the firearm nor the ammunition belonged to him. Rather, they belonged to some other individual who had access to the apartment, such as Hill, her thirteen year old son, or another boy friend. Nothing about the defendant's theory of the case relieved the Commonwealth of its burden of proving every element of the charged offenses beyond a reasonable doubt. Accordingly, the Commonwealth was required to establish that the items seized from Hill's apartment satisfied the statutory definitions of a "[f]irearm" and "[a]mmunition."

With respect to the firearm, it has been our jurisprudence that the Commonwealth need not present expert testimony to meet its burden of proof. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 204 (1965) (where weapon was loaded at time of seizure, and revolver and cartridges were introduced in evidence, jury could infer that gun was "[f]irearm" under § 121); *Commonwealth* v. *Stallions*, 9 Mass. App. Ct. 23, 25-26 (1980) (where revolver and cartridges taken from it were before jury as exhibits, along with testimony concerning them, jury could find, without aid of expert, that revolver was capable of discharging bullet).[15] See also *Commonwealth* v. *Sperrazza*, 372 Mass. 667, 670 (1977) (based on simple observation, jury could conclude that gun in question was weapon with barrel under sixteen inches long). However, in this case, the Commonwealth relied on the ballistics certificate, and related letter, to prove that the weapon seized from the closet of Lawanda Hill's apartment was a "[f]irearm" within the meaning of G. L. c. 140, § 121.[16] They were the only evidence that the weapon's firing mechanism was

---

[15]It is not clear whether the inferences that could be drawn by a jury with respect to the firing capability of a revolver (based primarily on observation and examination) could similarly be drawn with respect to a semiautomatic pistol.

[16]In addition, during closing argument, the Commonwealth made reference to the fact that the jury would be able to "look at the document describing [the weapon] being an operable firearm." The judge, in her instructions, told the jury that they could consider the ballistics certificate in determining whether the Commonwealth had satisfied its burden of proving that the objects at issue met the relevant statutory definitions.

operable. As such, they were potent and compelling evidence, and we are unable to conclude that their admission did not contribute to the verdicts, or had only very slight effect. Therefore, the Commonwealth has not met its burden of demonstrating that the erroneous admission of these documents was harmless beyond a reasonable doubt.

With respect to the ammunition, the Commonwealth again relied on the ballistics certificate to establish that it satisfied the statutory definition of "[a]mmunition." However, as we have stated, there is no functionality requirement for ammunition, and the Commonwealth was only required to show that it was designed for use in a firearm, rifle, or shotgun. Trooper O'Toole testified that, when the gun was found in the closet, it was loaded with three rounds of .380 caliber ammunition, the same caliber as the bullet found in the defendant's pants pocket, and the same caliber as the box of ammunition found in the bureau of the master bedroom. Similarly, Officer John Leonard testified that, when the weapon was recovered from the closet, the magazine was inside the handle and was loaded with three rounds of ammunition. The judge instructed the jury that "ammunition" includes bullets "designed for use in any firearm." We conclude that the admission of the ballistics certificate with respect to the ammunition was harmless beyond a reasonable doubt. The bullets themselves, which were admitted in evidence, and the testimony from Trooper O'Toole and Officer Leonard provided overwhelming evidence that the bullets met the statutory definition of "ammunition." See *Commonwealth* v. *Muniz, ante* 166, 173 (2010).

7. *Conclusion.* The defendant's convictions on two indictments charging unlawful possession of ammunition in violation of G. L. c. 269, § 10 (*h*), are affirmed. The defendant's conviction of furnishing a false name to a law enforcement officer is affirmed. The defendant's conviction of unlawful possession of a loaded firearm in violation of G. L. c. 269, § 10 (*n*), is vacated. The defendant's conviction of one indictment charging unlawful possession of a firearm in violation of G. L. c. 269, § 10 (*h*), is reversed. The Commonwealth may, however, retry the defendant on this indictment. See *Kater* v. *Commonwealth*, 421 Mass. 17, 18 (1995) ("If the evidence admitted at the trial was sufficient to send the case to the jury, but is insufficient to send the

case to the jury if all improperly admitted evidence is disregarded, double jeopardy principles nevertheless do not bar a retrial"); *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 45 (1992), *S.C.*, 427 Mass. 414 (1998). This case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*