COMMONWEALTH *vs.* JASON M. PALMER.

No. 02-P-784.

Worcester. June 6, 2003. - September 25, 2003.

Present: BECK, KASS, & DOERFER, JJ.

*Robbery. Evidence,* Fingerprints, Business record, Joint enterprise, Joint venturer. *Joint Enterprise. Practice, Criminal,* Instructions to jury.

At the trial of indictments charging armed robbery while masked and other crimes, fingerprint evidence was sufficient to identify the defendant as a participant in the crimes, where the circumstances surrounding the discovery of the defendant's fingerprints on a vehicle that had been at the crime scene, and the orientation of the fingerprints, reasonably excluded the hypothesis that the defendant had placed his prints on the vehicle at a time other than during the crime, and where additional evidence linked him to the crimes. [420-421]

At the trial of indictments charging armed robbery while masked and other crimes, the judge properly admitted in evidence for a limited purpose business records showing that, shortly before the crimes took place, a person giving the defendant's name and address had purchased two walkie-talkie radios, one of which was the same model as was used in the crimes and another that could communicate with the one used in the crimes, where the evidence, even admitted for the limited purpose, could permissibly support an inference linking the defendant to the crimes. [421-422]

The evidence at the trial of indictments charging armed robbery while masked and other crimes was sufficient to convict the defendant under a joint venture theory. [422-423]

At the trial of indictments charging armed robbery while masked and other crimes, the judge's instructions to the jury sufficiently conveyed to them the substance of the idea that they had to find that the defendant knew that some other individual was armed with a dangerous weapon in order to convict the defendant on a joint venture theory; even if the instruction was insufficient, the failure to instruct on an essential element of the crime charged, although an error of constitutional dimensions, was not among the small class of errors that required automatic reversal, and there was no likelihood, given the overwhelming evidence, that the jury's verdict would have been different if the omitted instruction had been given. [424-426]

INDICTMENTS found and returned in the Superior Court Department on March 16, 2000.

The cases were tried before *James P. Donohue*, J.

*David B. Mark* for the defendant.

*Harry D. Quick, III*, Assistant District Attorney, for the Commonwealth.

DOERFER, J. The defendant was convicted by a jury of armed robbery while masked, G. L. c. 265, § 17, and related crimes.[1] The evidence described a robbery of a BJ's Wholesale Club (BJ's) in Leominster, by two individuals armed with handguns and wearing masks. They were aided by a third man who was in communication with the first two by means of a walkie-talkie radio. The defendant challenges the sufficiency of the evidence, which included the defendant's fingerprints on a vehicle used to escape from the scene and certain business records showing the recent sale of walkie-talkie radios to a person giving the name and address of the defendant. He also claims the jury charge omitted sufficient references to the requirement that a joint venturer must have knowledge that the perpetrators inside the store were armed. We affirm.

1. *Facts.* We set forth the evidence favorable to the Commonwealth in some detail in order to review the reasonableness of the inferences that the jury were asked to make to identify the defendant as a perpetrator of the crimes charged. At least three persons were involved in a masked armed robbery of BJ's in Leominster on July 8, 1999. As he was performing his closing duties at the store around 9:00 P.M.,[2] Jeremy Laroche, the store closing manager, was confronted by two men wearing dark hooded sweatshirts, dark pants, dark gloves, and "Darth Maul" masks. He noticed the taller of the two had a silver revolver and later saw that the shorter man had a very small black or dark blue semiautomatic handgun. The taller man seemed, to Laroche, to be in charge. The smaller man had a Hispanic accent. The taller of the two was between five feet ten inches and six feet tall. Some blond hair was sticking out where his hood reached the mask. He appeared to Laroche to be thin,

---

[1]Armed carjacking, G. L. c. 265, § 21A; stealing from a depository, G. L. c. 265, § 21; and two counts of assault and battery, G. L. c. 265, § 13A.

[2]A night shift to stock the store was scheduled to begin between 10:00 P.M. and midnight.

about 180 pounds. The other man was around five feet eight or nine inches tall and had a "dumpy" build.

The taller man yelled at Laroche, threw him to the floor, and handcuffed him. When asked by the taller man if anyone else was in the store, Laroche told him a female employee was still present. One of them left, apprehended the other employee, Cheryl Buono, and brought her back where she was thrown on top of Laroche. Her hands were tied tightly behind her back with tie wrap. The assailants then asked who was the manager and Laroche told them he was. They uncuffed him, pulled him up, and re-cuffed him with his hands in front. They then took his keys and demanded to be taken to the safe. As they were walking toward the location of the safe, the shorter man went down an aisle and came back with two large, wheeled duffle bags. Buono was left on the floor and threatened with death if she screamed.

Laroche was then pulled into an aisle and relieved of his wallet. The taller man removed Laroche's license and told him they wanted to know his identity so they could get him if he "fucked them." The taller man also started talking via a two-way radio to a third man, asking him if it was all clear and whether any alarms were going off. The radio had the Radio Shack brand name on it. In the course of events, Laroche heard several transmissions in which the third man inquired whether there were any problems and how things were going.

The two assailants then led Laroche to the office where the cash was kept. They knew which door to go to even though there were several doors marked "employees only." The assailants directed Laroche to punch in a code to open the door and disarm the alarm. They pointed to the cash room within the office and identified the unlabeled alarm key pad without any guidance from Laroche.

They ordered Laroche to open the safe, which contained cash, gift certificates, and checks totaling over $51,000. The assailants put everything into the large duffle bags. Upon inquiry, Laroche told them that a cabinet in the cash room contained jewelry. They put the jewelry, worth about $27,000, into the duffle bags as well. They took Laroche's keys, including his truck keys, and the taller man said to the shorter one: "Let's go

get the tapes." The shorter man then led Laroche to a door marked "employees only." This was the security room containing a video surveillance system and surveillance tapes. The shorter man demanded the tapes for "today and yesterday."

The two assailants threw the loaded duffle bags onto a carriage and ordered Laroche to push it to the rear of the store. As they approached the back of the store, there was a heated conversation with the third man on the radio about what door to use to leave the building. The third man said the only vehicle in the area was a red truck. Laroche told them it was his. They made Laroche pick out his truck key from among the keys taken from him in the cash room and said they were going to take his truck. At the back door, they made him disable the alarm, threatening to kill him and Buono if the alarms went off. The shorter man then bound Laroche with cable wire that was kept in the tire area. He stood guard over Laroche while the taller one took the carriage with the duffle bags outside. Shortly thereafter, the shorter man joined the taller one outside, leaving Laroche and Buono tied up inside the store.

Another employee, Ronda Paris, had left the store at 9:30 P.M. and was waiting for a ride from her son. She was sitting at the entrance to the tire bay under a light reading a book. At about 9:50 P.M., as the taller assailant walked by on his way to Laroche's truck with the carriage and the duffle bags, he told her to get into a corner and not to look at him or he would shoot her. She saw he had a shiny object which she perceived to be a gun. After she turned around, she heard another person come to the passenger side of the truck, bang on the door, and ask to be let in. She also heard the sound of something being thrown into the bed of the truck and heard the driver say he had to "go around back and pick up my friend." There is a dirt roadway that goes to the back of the store.

Paris's son then arrived and she instructed him to call the police from a nearby hotel while she went back into the store to help free the two captives. Laroche called 911 and the police arrived within a minute. Laroche saw a brown car that looked like an old Oldsmobile or Pontiac moving slowly in the area of the business establishment next door and then take off quickly. As the police were approaching BJ's, they did not see the red truck on any of the roads in the vicinity of the store.

At 12:47 A.M., the police recovered the truck at the rear of a business a short distance from BJ's. It was parked at a loading dock in a corner in such a position that it could not be observed from the road. This location was about a two-minute drive from the back of BJ's. All businesses were closed when the truck was found.

The vehicle was a red Nissan pickup truck with bucket seats and an extended cab with a sliding window leading to the open bed. The window was equipped with a catch lock that Laroche kept locked. He had washed the truck within the week before the robbery and although he had parked it in the store parking lot and in other public places from time to time during that week, only he and his stepfather had access to and use of the truck, and his stepfather had not used it recently. Laroche did not know the defendant or know of any reason for the defendant to be in or around his truck at any time.

Several gloves were found in the truck that were similar to those worn by the assailants. A pair of Radio Shack walkie-talkies, model number 1804, were found in the truck. A custodian of the records of Radio Shack produced records showing that a Radio Shack walkie-talkie, model 1804, was sold on June 30, 1999, to a person who gave the name of Jason Palmer and an address of 3 Old Pickard Lane in Littleton. Another walkie-talkie, model 1803, was sold on June 28, 1999, to a person also giving his name as Jason Palmer and address of "3 Old Pickard Ln." The Radio Shack witness testified that the model 1803 walkie-talkie could communicate with the model 1804 found in the truck. In both cases, the purchaser gave a telephone number associated with the defendant. There was evidence the defendant had lived at 3 Old Pickard Lane in Littleton.

The defendant's fingerprints were found on the interior and exterior of the truck. One lift showed his fingers pointing downwards on the passenger door at the base of the passenger window frame. Another showed a fingerprint on the latch located in the interior of the truck by which the window opening into the bed of the truck could be made secure.

Telephone records were introduced in evidence showing several calls were made in June and July, 1999, from BJ's to a

telephone located at the address of the defendant's girlfriend. Evidence was also introduced showing two brothers named Sizemore worked at BJ's and had been seen associating with the defendant at that address.

2. *Fingerprint evidence.* Relying on *Commonwealth* v. *Fazzino,* 27 Mass. App. Ct. 485, 487 (1989), the defendant argues that the only identification evidence was his fingerprints at the crime scene and that there was insufficient evidence reasonably to exclude the hypothesis that those prints were placed on the truck at a time other than during the crime.[3] He points to the fact that there was a three-hour time interval between the commission of the crime and the discovery of the truck, during which his fingerprints could have been placed on the truck in circumstances unrelated to the crime. For example, he argued to the jury the truck could have been driven some distance to a location where he could have touched it before it was returned to the vicinity of BJ's. He also points out the truck was parked in public places for at least a week after Laroche washed it.

On the other hand, there was evidence that it was only a two-minute drive from BJ's to the place where the truck was found; the police arrived almost immediately and did not see the truck, which had been described to them, driving away from the scene; and the truck was "tucked in" behind an embroidery factory and not readily visible from the street, thereby making it unlikely someone would see it, approach it, and touch it during the three hours before it was found. It had been washed about a week earlier, providing a very small window of time during which the defendant was likely to come across it by chance. There was no evidence the truck had been broken into or tampered with since it was washed.

Even more unhelpful to the defendant's argument was the placement and orientation of the fingerprints. The one on the latch to the window leading to the truck bed showed the defendant had been inside the truck. Combined with the

[3]The general principle is that the presence of a fingerprint at the scene of the crime is not by itself a sufficient basis for submitting a case to a jury. The prosecution must couple the fingerprints with evidence that reasonably excludes the hypothesis that the fingerprints were impressed at a time other than when the crime was being committed. *Commonwealth* v. *Fazzino, supra* at 487. *Commonwealth* v. *Baptista,* 32 Mass. App. Ct. 910, 911 (1992).

testimony of Laroche that he kept that window closed,[4] this print leads to the reasonable inference that the window was opened by the assailants during the crime — by the hand of the defendant. Another print on the exterior of the passenger door, pointing downwards at the window opening, leads to the reasonable inference that the defendant grasped the door by the window opening and from the inside of the door, implying that he was sitting or riding in the truck.

Additional evidence linked him to the crimes. The jury could have found the perpetrators had some familiarity with the layout and operation of the store which was likely provided by insiders. They knew where the cash room was even though it was not marked. They knew about the video surveillance system, that tapes were kept on premises, and in which unmarked room. They knew where large duffle bags were kept for sale. Calls had been made to an address associated with the defendant from within the store and two employees of the store had been seen associating with the defendant at the address to which the phone calls were made.

This is not a case like *Commonwealth* v. *Morris*, 422 Mass. 254, 257-259 (1996), where the defendant's fingerprint on a mask used by an intruder was insufficient to link the defendant to the crime. In *Morris*, there was no way to discern when the defendant's fingerprint had been placed on the mask; a witness described the intruder as taller and heavier than the defendant; no strong evidence linked the defendant to a vehicle used to escape the scene; and some evidence could have linked the defendant to two other persons who had possession of a gun like that of the murder weapon. The court concluded that although the evidence permitted a conclusion that the defendant might have been one of the intruders, it did not permit that inference to be made beyond a reasonable doubt. The evidence in the case at bar, as discussed above, is not so infirm.

3. *Information in business records.* An additional link to the defendant was provided by the Radio Shack records. On two occasions shortly before the crimes were committed, a person who gave the defendant's name and address purchased two

---

[4]As mentioned above, Laroche also testified he did not know the defendant and the defendant had no occasion to use or be inside the truck.

walkie-talkies: the same model walkie-talkie found in the truck and another one which could be used to communicate with it. The defendant argues that, in response to his objection, the judge only admitted that evidence for a limited purpose. Citing *Commonwealth* v. *Koney*, 421 Mass. 295 (1995), the judge gave the jury a limiting instruction: that they could not use the business record "to prove that this defendant actually purchased those items, or that he actually lived at that address, 3 Picard [*sic*] Lane in Littleton, Massachusetts, or that . . . his telephone number was [the one given] . . . ." But the judge, in his final charge, went to some trouble to explain the difference between direct evidence and circumstantial evidence, and clearly permitted the business record to be used as evidence that someone, if not the defendant himself, had used the defendant's name, address, and telephone number when purchasing the walkie-talkies. This was a relevant circumstance linking the defendant to the crime. Even if it was not admitted as direct evidence of his identity as the person who purchased the walkie-talkies, it was a circumstance that could permissibly support such an inference.

4. *Joint venture issues.* There was evidence at trial suggesting that, if the defendant were one of the two men in the store, he was the taller of the two. Laroche observed some blond hair showing between the mask and the black hood of the sweatshirt worn by the taller man. Although defendant's hair color at trial was dark, there was evidence that he had dyed it blond near the time of the incident. The defendant was about the same height and build as the taller man. The shorter man spoke with a Hispanic accent; the defendant, however, did not, and is not Hispanic.

The judge instructed the jury that they could return a verdict of guilty if they found the defendant committed the offense himself or "that if he didn't commit the offense he was a joint venturer." The jury verdict slip stated, "If you have determined that the defendant is guilty beyond a reasonable doubt, please check off the theory on which you based your verdict:" followed by two boxes marked "Individual Liability" and "Joint Venture Liability." On each verdict slip, the joint venture liability box was checked. The defendant argues the jury thus

rejected the theory that the defendant was the taller man because the taller man was the only person who could be found to be individually liable on the evidence. He argues the evidence permitted a finding that there was only one active perpetrator and the evidence was not sufficient to support a finding that the defendant was one of the other two passive participants in the crime. The defendant's reasoning is faulty.

Although there was strong evidence that the taller man was the more active participant in these crimes, there was also evidence that the shorter man committed the offenses actively and did not just stand by to help. For example, he was armed with a handgun; he directly assaulted the victims with his gun and by putting his hands on them; he had an active role in obtaining the duffle bags; and he took the security tapes. This was a case in which both perpetrators inside the store had sufficiently active roles to characterize them both as having individual liability for themselves and joint venture liability as to the other. There was sufficient evidence to defeat the defendant's motion for a required finding of not guilty on joint venture liability.[5] See *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 418-419 (1996); *Commonwealth* v. *Ramirez*, 55 Mass. App. Ct. 224, 230 (2002).

The defendant argues the jury were not permitted by the judge's instructions to return a verdict of guilty on a joint venture theory because even though the evidence permitted them to conclude the defendant was one of the perpetrators, they could not determine which one. But the judge, however, properly told the jury they could find the defendant guilty on joint venture liability or individual liability or both. See *Commonwealth* v. *Netto*, 438 Mass. 686, 700-701 (2003). "While the circumstantial evidence may strongly suggest which of the joint venturers was the principal perpetrator, the jury may not be convinced of the defendant's principal liability beyond a reasonable doubt. If the jury have such doubt, they may still convict if they are convinced beyond a reasonable doubt that the elements of joint venture were proved." *Id.* at 701.

---

[5]We need not consider the sufficiency of the evidence that the defendant was the lookout at the other end of the walkie-talkie, since the evidence was sufficient to assign joint venture liability to him as one of the perpetrators in the store.

5. *Jury instruction on knowledge of mask and weapon.* The defendant argues the judge failed to instruct the jury that they had to find the defendant, as a joint venturer, knew his co-venturers were armed. The judge told the jury, in material part, the following:

> "Now, the test for joint venture — any one of these crimes, assault and battery, carjacking, confining and putting in fear, armed robbery — the test for joint venture is this: Whether this defendant was present at or near the scene of the crime, he was present at or near the scene of the crime with *knowledge* that some other individual or individuals intended to commit *those specific crimes*, and that the defendant was, by agreement, ready, willing, and able to help the others if necessary" (emphasis supplied).

The judge had also defined the specific crime of armed robbery as requiring the use of a dangerous weapon. Although it would have been better if the judge had specifically stated that the jury had to find the defendant knew that some other individual was armed with a dangerous weapon, we think the words used by the judge conveyed the substance of that idea. The jury were told they had to find that the defendant was present with knowledge that some other individual intended to commit the specific crime of masked armed robbery — in other words, that the other person was armed.

In *Commonwealth* v. *Colon,* 52 Mass. App. Ct. 725, 729-730 (2001), we rejected the argument that an instruction that the defendant "participated or intentionally aided or assisted in the commission of the crime . . . [and] did so while sharing the intent, the mental state, required to commit the crime" adequately conveyed the requirement that the jury must find the defendant knew the other person was armed. In the case at bar, the judge went further and required the jury to find the defendant knew that the other person intended to commit an armed robbery, i.e., a crime having a component that entails the use of a weapon.

Even if we regard the instruction as insufficient, the failure to instruct on an essential element of the crime charged — although an error of constitutional dimensions — is not among the small class of such errors which requires automatic reversal.

*Commonwealth* v. *Redmond,* 53 Mass. App. Ct. 1, 6-7 (2001). Rather, if an objection had been made, the record must be reviewed to determine whether the error is harmless. *Ibid.* Where, as here, no objection was made, the question is whether there is a substantial risk of a miscarriage of justice. *Ibid.*

The standard of review to determine whether an error at trial created a substantial risk of a miscarriage of justice has been set forth in *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 (1999):

> "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict. In making that determination, we consider the strength of the Commonwealth's case against the defendant (without consideration of any evidence erroneously admitted), the nature of the error, whether the error is 'sufficiently significant in the context of the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error,' and whether it can be inferred 'from the record that counsel's failure to object was not simply a reasonable tactical decision.' " (Citations and footnote omitted.)

In *Colon, supra,* as in *Commonwealth* v. *Watson,* 388 Mass. 536, 546 (1983), the court held the failure to give an explicit instruction on the requirement that the defendant knew the other actor was armed, even though no objection was made at trial, resulted in a substantial risk of a miscarriage of justice. Again, the facts in those cases distinguish them. In *Colon, supra* at 726-727, the defendant was standing on a train platform next to the victim while another man stood on the other side of the victim and made an implied threat to attack him with a weapon concealed but barely showing in his pocket. In that case we held the evidence of the defendant's knowledge about the weapon was sufficient to defeat a motion for required finding of not guilty because the robbery took place in a public place "under circumstances where it can be anticipated that a means must be found to persuade the victim to surrender his property quickly and without resistance." *Commonwealth* v. *Colon,* 52 Mass. App. Ct. at 728. Nevertheless, we held that the *Colon* jury could well have concluded, in spite of the sufficiency of the evidence, that the defendant did not know about the weapon

yet still find him guilty, in the absence of the required instruction. *Id.* at 730-731.

In *Watson, supra* at 538-539, the witness to the shooting of a taxicab driver during a robbery was unable to see whether the person who shot the victim was actually displaying a gun in a way that the defendant could have seen it before the shooting occurred. Unless the jury knew that they had to find the defendant knew about the gun before the shooting, there was a substantial risk that they could have convicted the defendant based merely on his participation in the robbery (which in that case could have been accomplished by the three perpetrators without a weapon). *Id.* at 546. Cf. *Commonwealth* v. *Charles,* 57 Mass. App. Ct. 595, 597-599 (2003) (where objection to charge was made and error was not harmless).

Here we must consider the strength of the Commonwealth's case that each of the three participants in the joint venture knew the two inside the store were masked and armed. The evidence was overwhelming that both perpetrators in the store were armed. There is no likelihood the jury's verdict would have been different if the omitted instruction had been given and the jury viewed the defendant as one of the two persons inside the store. There was also overwhelming evidence that the third man was kept aware of the status of the operation by walkie-talkie. The crime was an elaborate venture requiring detailed planning and was unlikely to be accomplished successfully without weapons and masks. As the third man knew the first two had their victims under control for some extended period of time, there was no real risk the jury would have reached a different result if they had been expressly told that they had to find beyond a reasonable doubt that the third man knew the other two were using masks and guns.

*Judgments affirmed.*