NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1109                                          Appeals Court


COMMONWEALTH  vs.  RODNEY McCRAY.


No. 16-P-1109.

Essex.      December 11, 2017. - August 31, 2018.

Present:  Rubin, Lemire, & Shin, JJ.


Assault and Battery by Means of a Dangerous Weapon.
     Identification.  Constitutional Law, Identification,
     Harmless error.  Evidence, Identification, Joint venturer.
     Joint Enterprise.  Practice, Criminal, Motion to suppress,
     Required finding, Instructions to jury, Harmless error,
     Defendant's decision not to testify.  Error, Harmless.



     Indictments found and returned in the Superior Court
Department on September 25, 2013.

     A pretrial motion to suppress evidence was heard by David
A. Lowy, J., and the cases were tried before Timothy Q. Feeley,
J.


     David B. Hirsch for the defendant.
     Marina Moriarty, Assistant District Attorney, for the
Commonwealth.


     SHIN, J.  On the afternoon of August 30, 2013, two men

attacked another man on a public street, inflicting life-

altering injuries.  Both men punched the victim, one slammed him

to the pavement, and one or both kicked him while he lay on the ground.  After an eyewitness identified the defendant as one of the assailants, the defendant was indicted on charges of assault and battery, assault and battery by means of a dangerous weapon (to wit, pavement) causing serious bodily injury (ABDW-SBI), and assault and battery by means of a dangerous weapon (to wit, shod foot).  A jury convicted the defendant of all three charges.[1]

On appeal the defendant argues that (1) the motion judge should have suppressed the eyewitness's identification, (2) the evidence was insufficient to support a conviction of ABDW-SBI under a theory of joint venture, (3) the trial judge erred in instructing the jury on the intent required for ABDW-SBI under a theory of joint venture, and (4) the trial judge failed to instruct the jury that they could draw no adverse inference from the defendant's failure to testify, despite his request for such an instruction.  As to the third of these arguments, we agree that the joint venture instructions were erroneous because they did not convey to the jury that the defendant must have shared his coventurer's intent to use a dangerous weapon to be guilty of ABDW-SBI.  Nonetheless, we conclude that there is no substantial risk of a miscarriage of justice because the jury,

---

[1] The jury acquitted the defendant of intimidation of a witness.

by convicting the defendant of assault and battery with a shod foot,[2] necessarily rejected his theory that he withdrew from the assault before the climactic moment when the pavement was used as a dangerous weapon. Instead, the jury necessarily found that the defendant consciously acted together with his coventurer throughout the course of the assault, including at that climactic moment. Accordingly, and as we reject the defendant's remaining arguments, we affirm.

Background.[3] 1. The assault. Jesse Downs was walking on Winter Street near Lafayette Square in Haverhill when, seemingly without provocation, two men attacked him. Four eyewitnesses to the assault testified at trial as follows.

Maria Baez, a childhood acquaintance of Downs, was driving on Winter Street when she saw Downs and rolled down her window to say hello. Before she could do so, two "dark complexion[ed]" men walking behind Downs yelled something that caught his attention. They approached and immediately started punching Downs in his upper body. The shorter man held Downs's hands, while the taller man with tattoos "continued to punch, and at

---

[2] The jury were instructed only as to principal liability on that charge.

[3] We summarize the evidence, and the reasonable inferences therefrom, in the light most favorable to the Commonwealth. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

one point lift[ed] Downs off the floor and dropped him on the ground."  One of the two men -- Baez did not remember which -- then kicked Downs, while the other stood nearby, before both took off running down the street.  Baez telephoned 911 and followed the two men as they ran up Winter Street.  A third man was at the scene but did not participate in the assault.

Christopher Siek was driving on Winter Street when he saw two "dark-skinned" men punching a white man in the torso, while a third man stood off to the side.  As the victim went into the street to avoid the punches, one of the two men followed him, "picked him right up and just slammed him down . . . [l]ike a body slam."  The attack "happened so fast [Siek] couldn't do anything."  After Siek sounded his horn, the three men ran up the street.

Kenneth Farinelli was driving through Lafayette Square when he saw "[t]hree African American[s]" standing around a white man.  One of the men "picked [the victim] up from around the waist" and "slammed [him] on his head."  The three men then "ran off."

James Flanagan was driving through Lafayette Square when he saw two men with "dark skin" attacking a white man.  One "fairly tall" man "picked [the victim] up and body slammed him."  Both men then kicked the victim in the head before running down the

street together.  A third man was there but was not involved in the assault.

Downs was transported to the hospital, where he collapsed in the waiting room and was airlifted to another hospital to undergo emergency brain surgery.  Four months after the assault, he was finally released from a rehabilitation facility.  By the time of trial in June of 2015, Downs was still confined to a wheelchair, dependent on a feeding tube, and had a pump in his stomach "to control the tone in his body."  According to his girl friend, Downs "needs assistance with everything" -- "[h]e can't go to the bathroom on his own, he can't shower on his own."

2.  The investigation.  Haverhill police Officer Bryan Bailey was dispatched to Winter Street following "a report that a male was laid out after being beat up."  As he was heading that direction, he was redirected to a different location about one-quarter of a mile away.  There, he saw two men matching the descriptions provided by dispatch.  One man, later identified as the defendant, was wearing jeans and had a black tank top draped over his shoulder.  The other man was wearing a white shirt and jeans.

Officer Bailey stopped the defendant and asked to speak with him.  The defendant "went off," "flailing his arms and yelling and screaming."  The officer then asked dispatch to

"have the witness that was following [the two] individuals come to [his] location." Although the officer did not see anyone arrive, he was told by dispatch "that the witness had driven by and said the party [he] had stopped was the correct person."[4]

Officer Bailey drove the defendant back to the scene of the assault. As he was taken out of the cruiser, the defendant started yelling at Downs, to the effect of "I hit you? You said I fucking hit you?" When Downs could not make an identification, the officer returned the defendant to the cruiser and drove him to the police station. During booking the defendant's height was recorded as six feet, two inches, and his weight as 160 pounds.

Officer Jamie Landry headed to a different location in search of the second suspect wearing the white shirt and jeans. There, he saw a man known to him as Xavier Simms. Although Simms admitted he had been with the defendant, the officer allowed him to leave because he did not match the description of either suspect.

Ten to fifteen minutes later, Officer Landry saw Simms again, a few blocks from his previous location. Simms was with the defendant's brother and a man known to the officer as

---

[4] This witness was Baez, and her identification was the subject of the defendant's motion to suppress. We discuss the identification in greater detail, infra.

Roberto Hilerio.  Several hours later, the three men entered the police station asking about the defendant.  Sergeant Meaghan Buckley interacted with them and saw no tattoos on either Hilerio or Simms.  At some time thereafter, Hilerio was arrested in connection with the assault; during booking his height was recorded as five feet, ten inches, and his weight as 180 pounds.

Officer Dennis Moriarty was transporting the defendant from the police station on the night of the assault.  While seated in the cruiser, the defendant asked "multiple different times, different ways," "how much time he could get for the crimes," "if he was going to get life," and "if he told the truth, could he get less time."  He also said, "Seriously, I didn't kill no one, right? . . . I'm just going to say everything I did.  I can't go away for life."

Also that night, the police interviewed Baez.  She described one suspect as "tall and skinny kind of like muscled with tattoos on his arms," wearing a black tank top and jeans, and the other as "probably about five something height" wearing a white shirt and jeans.  She stated that "[t]he much taller, tattooed, dark-skinned guy lifted [Downs] in the air and smashed him against the ground."  She also stated that the "much taller" man "was the one [who] did the kicking."

In October of 2013, Sergeant Buckley interviewed Flanagan, who recalled that "the bigger of the two" men "grabbed . . . the

white guy and picked him up and slammed him on his head." According to Flanagan, the man with the white shirt was "le[ss] aggressive" and "smaller." He also stated that he saw an officer with "the bigger," "well-built" man, and that that man was the one who had picked the victim up and dropped him on the ground.

At trial the prosecutor asked the defendant to remove his shirt and show his arms, hands, and shoulder to the jury. When he did so, he revealed three tattoos -- one on each hand and one on his right shoulder.

3. The defendant's case. The defense's theory at trial was that, while the defendant "threw a couple punches," he had stopped punching when "out of nowhere" Hilerio "ran up, grabbed Mr. Downs from behind, and picked him up and slammed him onto the street." The defendant was merely "standing there watching this whole thing unfold."

In support of this theory, the defense elicited testimony from Officer Guy Cooper that Baez told him at the crime scene that a man "with a white t-shirt" had slammed Downs to the ground. The defense also called Simms, who testified that the defendant had "stopped throwing punches" and "backed up" when Hilerio "jumped in," picked Downs up, and dropped him. According to Simms, the defendant was just "standing there," and "then after that, he took off." Finally, the defense called the

defendant's brother, who testified that Hilerio told him that "he slammed the guy down" and the defendant "didn't know he was going to do it."

Discussion. 1. Motion to suppress. The motion judge made the following findings regarding Baez's identification. After witnessing the attack, Baez telephoned 911 and gave a description of the suspects. She continued to relay information to dispatch as she followed the suspects in her vehicle.

Within two to four minutes of the 911 call, Officer Bailey saw an individual, identified at the motion to suppress hearing as the defendant, who matched Baez's description. The officer stopped the defendant on Fifth Avenue and conducted a patfrisk. The defendant became "very agitated" and started "flailing his arms and yelling." As a result, the officer arrested the defendant for disorderly conduct, handcuffed him, and put him in the cruiser.

While this was happening, the dispatcher told Baez to go to Fifth Avenue and wait in her vehicle for an officer to come over. Instead of following these instructions, Baez drove by and observed the defendant with Officer Bailey. She then telephoned back to dispatch and stated that the person the officer was holding was one of the perpetrators. When Baez drove by, Officer Bailey was in the process of arresting the defendant but had not yet placed him in the cruiser.

Based on these findings, the motion judge ruled that Baez's identification was admissible because it did not result from "unnecessarily suggestive" circumstances. We review this ruling only for abuse of discretion as it is uncontested that the identification did "not arise from a police procedure." See Commonwealth v. Johnson, 473 Mass. 594, 602 (2016). An abuse of discretion occurs if the "decision resulted from a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives." Ibid. (quotation omitted).

Out-of-court identifications made without police wrongdoing are analyzed under common law principles of fairness, as articulated in Commonwealth v. Jones, 423 Mass. 99, 109 (1996). See Johnson, 473 Mass. at 598. A judge applying those principles "may decline to admit an unreliable eyewitness identification that resulted from a 'highly' or 'especially' suggestive confrontation with the defendant." Id. at 598-599, quoting from Jones, 423 Mass. at 109. The defendant bears the burden of proving suggestiveness by a preponderance of the evidence. See id. at 599. If he meets that burden, then the judge must weigh "the probative value of the identification against the danger of unfair prejudice" arising from the suggestive circumstances. Id. at 600.

Here, the motion judge assumed that the defendant was already handcuffed when Baez drove by, but concluded that that alone did not render the circumstances of her identification "unnecessarily suggestive."[5]  The defendant does not contend that the judge abused his discretion in this respect.  In fact, he concedes that the judge was correct.  See Commonwealth v. Phillips, 452 Mass. 617, 627-628 (2008) (showup procedure was not unnecessarily suggestive even though defendant was in police wagon, handcuffed and flanked by two officers).

Nevertheless, the defendant argues that Baez's identification was so unreliable -- because, among other reasons, she drove by quickly, while distracted, and without

---

[5] Although the judge phrased the inquiry in these terms, we note that unnecessary suggestiveness is the standard that applies to identification procedures conducted by the police. See Johnson, 473 Mass. at 604.  Where, as here, there is no allegation of police misconduct, the standard is whether the identification was made under "highly" or "especially" suggestive circumstances -- meaning, circumstances that are "so suggestive that there is a substantial risk that they influenced the witness's identification of the defendant, inflated his or her level of certainty in the identification, or altered his or her memory of the circumstances of the operative event." Id. at 603-604.  Under either standard, however, the result is the same.  As the judge correctly observed, if the procedure would not have been unnecessarily suggestive had it been conducted by the police, "a common law analysis provides no more protection." See Commonwealth v. McWilliams, 473 Mass. 606, 617 (2016), quoting from Johnson, 473 Mass. at 603-604 (where identification was made "in circumstances comparable to a permissible showup conducted by a police officer," procedure "could not have been 'especially suggestive' because it was conducted by a third party").

stopping to hear instructions from the officer -- that it should have been suppressed.  But under the Jones framework, a judge need not conduct a reliability analysis unless the defendant first demonstrates the existence of especially suggestive circumstances.  See Jones, 423 Mass. at 109; Johnson, 473 Mass. at 604.  Because the defendant failed to make that showing here, the motion judge properly left the reliability of Baez's identification to the jury to decide.

2.  Sufficiency of the evidence.  The defendant challenges the sufficiency of the evidence only as to his conviction of ABDW-SBI.  As to this charge, the Commonwealth proceeded on theories of both principal and joint venturer liability, and the jury returned a general guilty verdict.  While not contesting that the evidence was sufficient to convict him as a principal, the defendant argues that he could not be convicted as a coventurer because the Commonwealth failed to prove that he knew or intended that Hilerio would throw Downs to the pavement.  In considering this challenge, we review the evidence in the light most favorable to the Commonwealth to determine whether any "rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt."  Commonwealth v. Mendez, 476 Mass. 512, 523 (2017).

The flaw in the defendant's argument is that, under Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009), a reviewing

court does not "examine the sufficiency of the evidence separately as to principal and joint venture liability." Instead, we ask "whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." Ibid. See Commonwealth v. Housen, 458 Mass. 702, 706-707 (2011); Commonwealth v. Barbosa, 477 Mass. 658, 665 (2017). Regarding the charge here, the intent required is general -- the Commonwealth must prove "that the defendant intentionally touched the victim . . . with an inherently dangerous weapon or an object used in a dangerous fashion" without justification, resulting in serious bodily injury.[6] Commonwealth v. Vick, 454 Mass. 418, 432 (2009).

Viewed in the light most favorable to the Commonwealth, the evidence supports a finding that the defendant was the assailant who threw Downs to the pavement, establishing that the defendant had the requisite knowledge and intent to commit the crime. Baez testified and stated in her police interview that the taller man with tattoos dropped Downs on the ground. Similarly, Flanagan testified that the "fairly tall" man "body slammed"

---

[6] The defendant does not contest that the pavement qualifies as a dangerous weapon, that the touching was without justification, and that Downs's injuries were serious.

Downs, and he stated in his police interview that the "bigger" man picked Downs up and dropped him. Given the additional evidence that the defendant was four inches taller than Hilerio, and has tattoos while Hilerio does not, a rational jury could have found that it was the defendant himself who slammed Downs to the pavement, causing his grievous injuries.

Furthermore, even examining the evidence of joint venture separately as the defendant requests,[7] we conclude that it was sufficient to support his conviction. "[T]here is no need to prove an anticipatory compact between the parties to establish joint venture . . . if, at the climactic moment the parties consciously acted together in carrying out the criminal endeavor." Commonwealth v. Sexton, 425 Mass. 146, 152 (1997) (quotation omitted). Here, there was testimony from several witnesses that the defendant and Hilerio acted in concert throughout the course of the assault. The two men approached Downs together and attacked him in a coordinated fashion, one holding his hands while the other punched him. After Downs was thrown to the pavement, the defendant continued the assault by kicking him. The two men then fled together. "At no time

---

[7] We entertain the defendant's argument as it is relevant to our discussion, infra, regarding the instructions on joint venture.

during [the] conflict did the defendant seek to withdraw."
Ibid.

From this evidence the jury could have found that the defendant had the intent to touch Downs with the pavement in a dangerous fashion. See Vick, 454 Mass. at 432. Contrary to the defendant's contention, the Commonwealth did not need to prove that he knew or intended in advance that the pavement would be used during the assault. See Sexton, 425 Mass. at 152. Rather, the jury could have inferred the requisite knowledge and intent from the evidence that the defendant kicked Downs immediately after he was slammed to the pavement. See ibid. (although defendant "may not initially have had knowledge that his brother intended to use the pavement to effectuate the attack," jury could still convict him as coventurer based on his actions of "continuously kick[ing] and punch[ing] [the victim] while his brother repeatedly slammed [the victim's] head into the pavement"); Commonwealth v. Lugo, 89 Mass. App. Ct. 229, 232-233 (2016) (evidence sufficient to support conviction of assault and battery with knife, where defendant and coventurer pursued victim together and defendant kicked victim while coventurer stabbed him). Cf. Commonwealth v. Johnson, 92 Mass. App. Ct. 538, 545 (2017) (there was probable cause that defendant shared intent to use glass as dangerous weapon, where "after [coventurer] struck the victim with the glass, [defendant] did

not retreat from the combat, but instead went after the victim himself").

3. Instructions on joint venture. We next consider the defendant's challenge to the joint venture instructions, which he says were deficient because they failed to "advise the jury that the aider and abettor needed to share the principal's intent that some dangerous weapon be used." Consistent with Zanetti, 454 Mass. at 467-468, the trial judge instructed the jury that the defendant was guilty of ABDW-SBI if the Commonwealth proved beyond a reasonable doubt that he "knowingly and meaningfully participated in the commission of the crime of [ABDW-SBI]" and "had the intent required for that particular crime." The judge then gave a more specific instruction on intent. After first explaining that the principal must have "intentionally used pavement as a means of inflicting serious harm," the judge instructed as follows on the intent required of an aider and abettor:

> "The intent required [of] an aider and abettor is different. The aider and abettor must have intended a joint venture with the principal to assault and batter Jesse Downs. The aider and abettor need not have agreed to use pavement as a dangerous weapon, or even known or intended that the principal use pavement as a dangerous weapon.

> "The aider and abettor must have intended that he and the principal would jointly commit an assault and battery upon Jesse Downs. That is, the aider and abettor must have intended a joint enterprise with the principal to assault

and beat Jesse Downs in a harmful way, without justification or excuse."

We agree with the defendant that these instructions were erroneous in that they would have allowed the jury to convict the defendant of ABDW-SBI upon mere proof that he intended jointly with Hilerio to commit a simple assault and battery. The Commonwealth's burden was higher:  it had to prove that the defendant knowingly participated in the commission of the charged offense "with the intent required for that offense," Zanetti, 454 Mass. at 468, which for ABDW-SBI includes intent to use a dangerous weapon.  But it is not the case, as the defendant argues, that "such proof could be established only by evidence that Mr. Hilerio communicated to [the defendant] that he intended to . . . use the pavement as a weapon or that [the defendant] urged him to use or otherwise supported his use of it."  Again, the jury could infer the requisite intent from evidence that "at the climactic moment the parties consciously acted together in carrying out the criminal endeavor."  Sexton, 425 Mass. at 152 (quotation omitted).  See Lugo, 89 Mass. App. Ct. at 232-233; Johnson, 92 Mass. App. Ct. at 544-545. Nevertheless, the instructions here, viewed as a whole and notwithstanding the judge's accurate statement of Zanetti, did not clearly apprise the jury of this element of the crime.  See Commonwealth v. Thomas, 401 Mass. 109, 119 (1987), quoting from

Connolly v. Commonwealth, 377 Mass. 527, 536 (1979) ("[N]o general statement of the charges can remedy a specific instruction which is defective 'unless the general statement clearly indicates that its consideration must be imported into the defective instruction'").

The error does not, however, require automatic reversal of the defendant's conviction as he suggests. "Although constitutional error, the omission of an element of the crime from the jury instruction is not among the very limited class of structural errors subject to automatic reversal, and upon proper objection would be subject to harmless error analysis." Commonwealth v. Redmond, 53 Mass. App. Ct. 1, 7 (2001). See Commonwealth v. Palmer, 59 Mass. App. Ct. 415, 424-425 (2003). The defendant claims that he preserved his objection, but the record demonstrates, to the contrary, that he affirmatively agreed with the instructions.[8] We must therefore determine

---

[8] As the defendant notes, lead defense counsel and the judge had an extended discussion about the intent element of the offense. At no point, however, did counsel object to the instructions. He failed to do so despite the judge's expressed concerns that it appeared as though counsel "[didn't] agree with [the] instructions" and that he (the judge) "didn't quite understand . . . [counsel's] contentment with these instructions." Nonetheless, counsel stated three times that he agreed. And although the defendant's second counsel indicated that he did have concerns, he chose not to specify the nature of his objection, stating that he "[didn't] want to confuse anyone else." Furthermore, after the judge finished instructing the jury, lead counsel again stated that he was content. From these circumstances we conclude that the objection was not preserved.

whether the error created a substantial risk of a miscarriage of justice. See Commonwealth v. Alphas, 430 Mass. 8, 15 (1999); Commonwealth v. Loadholt, 456 Mass. 411, 427 (2010). This standard requires us to "review the evidence and the case as a whole, considering the strength of the Commonwealth's case, as well as the nature and significance of the alleged errors." Commonwealth v. Chase, 433 Mass. 293, 299 (2001). After doing so, we will reverse the verdict "only in the extraordinary situation where . . . we are left with uncertainty that the defendant's guilt has been fairly adjudicated." Ibid.[9]

The Commonwealth argues that no substantial risk of a miscarriage of justice exists because "the overwhelming weight of credible evidence suggested that the defendant" was the principal in the assault. It is true that, under the substantial risk standard, overwhelming evidence of guilt can overcome an error in instructing on an element of the offense. See Alphas, 430 Mass. at 15. But the evidence here, while

_____

[9] Our dissenting colleague suggests that we must presume a substantial risk of a miscarriage of justice where there has been an instructional error on an element of the offense. See post at      . But to the contrary, the Supreme Judicial Court and this court have repeatedly held that such an error does not require reversal where the circumstances reveal that it did not materially affect the guilty verdict. See, e.g., Alphas, 430 Mass. at 15; Loadholt, 456 Mass. at 427; Palmer, 59 Mass. App. Ct. at 426; Commonwealth v. Velez, 82 Mass. App. Ct. 12, 19-20 (2012).

certainly sufficient to convict the defendant as the principal, would also support a finding that Hilerio was the one who threw Downs to the pavement.[10]  The cases suggest that a greater quantum of evidence is needed for us to conclude that justice did not miscarry.  See Commonwealth v. Azar, 435 Mass. 675, 688-689 (2002) (erroneous malice instruction created substantial risk of miscarriage of justice where Commonwealth's evidence was "strong" but "controverted" and malice could not be "ineluctably inferred").

The verdicts that the jury actually returned, however, allow us to conclude that there is no substantial risk of a miscarriage of justice.  Even under harmless error analysis, "an instructional omission, misdescription, or conclusive presumption" does not mandate reversal "where other facts necessarily found by the jury are the 'functional equivalent' of the omitted, misdescribed, or presumed element."  Neder v. United States, 527 U.S. 1, 13 (1999).  Cf. Commonwealth v. Britt, 465 Mass. 87, 98-99 (2013) (omission of instruction on knowledge of dangerous weapon did not create substantial

---

[10] In particular, such a finding would be supported by Simms's testimony and Siek's statement in his police interview that the "small, thin one, that was about five-eight, [was] the suspect who slammed the white boy on the ground."  There was also conflicting evidence about the color and type of shirt worn by the principal assailant.

likelihood of miscarriage of justice where jury, by convicting defendant of other counts, necessarily found that she herself possessed a firearm); United States v. Baldwin, 987 F.2d 1432, 1438-1439 (9th Cir. 1993) (failure to give overt act instruction was harmless error where jury could not have convicted defendant of other counts without finding overt act); United States v. Johnson, 216 F.3d 1162, 1167 (D.C. Cir. 2000) (error in defining "use" and "carry" was harmless where jury could not have convicted defendant of another count without finding "act that constitutes both 'using' and 'carrying'"). Furthermore, where "the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." Neder, 527 U.S. at 17. See Alphas, 430 Mass. at 15; Loadholt, 456 Mass. at 427.

In this case, by convicting the defendant of simple assault and battery and assault and battery by means of a dangerous weapon (shod foot), the jury necessarily found that the defendant punched Downs and then kicked him once he was on the pavement. This means, in turn, that the jury necessarily rejected the defendant's theory that he threw a few punches and then withdrew from the conflict. Critically, this was the only theory presented by the defense. The defense did not argue, and no reasonable view of the evidence would permit a finding, that

the defendant withdrew from the rapidly unfolding conflict before Downs was thrown to the pavement, then returned to kick him moments later.  Therefore, by convicting the defendant of kicking Downs, the jury had to have found that he "consciously acted together" with Hilerio throughout the assault, including "at the climactic moment" when the pavement was used as a dangerous weapon.  Sexton, 425 Mass. at 152 (quotation omitted).

No substantial risk of a miscarriage of justice exists in these circumstances.  Under Sexton, proof that a defendant "consciously acted together" with his coventurer at the moment a dangerous weapon is used is alone sufficient to show the defendant's intent to commit assault and battery by means of that dangerous weapon.  Ibid.  Accord Lugo, 89 Mass. App. Ct. at 233.  Were the rule otherwise, assailants who participate in a group attack would be insulated from criminal liability where it is not possible to determine which one used which weapon or inflicted which injuries.  But in a joint venture situation, our law does not require the Commonwealth to prove who actually committed the crime and who aided and abetted it.  See Zanetti, 454 Mass. at 468.  Thus, it is enough here that the defendant was consciously participating in the assault at the point when either he or Hilerio used the pavement as a dangerous weapon.  See Sexton, 425 Mass. at 152; Lugo, 89 Mass. App. Ct. at 233.

Against this legal backdrop, the jury's finding that the defendant did not withdraw from the conflict is critical, and our reliance on that finding does not "eliminate[] the shared intent requirement," as the dissent posits. Post at      . Again, once the jury determined that the defendant kicked Downs, no view of the evidence would have allowed them to conclude that he was anything other than an active participant in the conflict when, moments earlier, Downs was thrown to the pavement. Contrary to the dissent's view, see post at      , it is of no legal consequence that the kicking occurred immediately after the assault with the pavement, as compared to Sexton where the two acts appeared to have occurred simultaneously. What matters is whether the defendant was consciously acting together with Hilerio during the assault with the pavement. The verdicts returned by the jury, in light of the evidence presented, compel the conclusion that he was.

In reaching the result that we do, we do not, as the dissent puts it, "in effect usurp the jury's function." Post at      . Rather, we "in typical appellate-court fashion, ask[] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." Neder, 527 U.S. at 19. Here, based on the evidence and the verdicts that the jury actually returned, we are confident that the error in the instruction did not materially influence the

outcome of the trial. That is, this is not the "extraordinary situation where . . . we are left with uncertainty that the defendant's guilt has been fairly adjudicated." Chase, 433 Mass. at 299.

4. Failure to give "no adverse inference" instruction. Finally, the defendant argues that the trial judge erred in failing to instruct the jury that they could not draw an adverse inference from the defendant's decision not to testify. Before the close of the Commonwealth's case, the defendant requested such an instruction, but the judge, it appears inadvertently, did not give one. Because the defendant did not bring the omission to the judge's attention, our standard of review again is whether there is a substantial risk of a miscarriage of justice. See Commonwealth v. Dussault, 71 Mass. App. Ct. 542, 544 (2008).

We discern no such risk. The judge gave a clear instruction in his opening remarks to the venire that the defendant had "an absolute right not to testify" and no "negative inference" could be drawn from his decision. See Commonwealth v. Cintron, 438 Mass. 779, 786 (2003) (instructions given to venire "will be considered along with the judge's final instructions in deciding whether the instructions were correct"). In his opening instructions to the jury, the judge reiterated that the defendant had "no obligation, no burden" to

call witnesses or offer evidence. And although in the final charge the judge did not use the specific words "adverse inference," he carefully instructed on the presumption of innocence and then stated: "The presumption of innocence also means that no person ever has to prove his innocence. No person charged with a crime ever has to explain anything or prove anything to a jury. Exactly the contrary is true." Considering these instructions as a whole, we view them as similar to those that the Supreme Judicial Court has held to "satisf[y] the requirement for an instruction minimizing the danger that the jury will draw an adverse inference from the defendant's decision not to testify." Commonwealth v. Gilchrist, 413 Mass. 216, 219 (1992). Cf. Commonwealth v. Feroli, 407 Mass. 405, 410-411 (1990) (no substantial likelihood of miscarriage of justice where judge did not use specific words "no adverse inference" but did instruct that "defendant has the absolute right to remain passive and require the Commonwealth to prove its case beyond a reasonable doubt").

Moreover, it is fair to say that the Commonwealth's case was strong, and defense counsel's failure to object to the omission of the instruction suggests that it had minimal significance in the overall context of the trial. In fact, we think it plausible, as the Commonwealth argues, that counsel could have made a tactical decision not to object in order to

draw the jury's attention away from "the question why the defendant decided not to assist the jury in their fact-finding function" and to focus them instead on the three witnesses who testified on his behalf. Commonwealth v. Buiel, 391 Mass. 744, 746-747 (1984). See Dussault, 71 Mass. App. Ct. at 545. And unlike in Commonwealth v. Botelho, 87 Mass. App. Ct. 846, 852-853 (2015), on which the defendant heavily relies, the prosecutor in her closing argument did not comment on the defendant's decision not to testify. In this situation we can conclude with confidence that the omission did not materially affect the jury's verdicts.

Judgments affirmed.

RUBIN, J. (dissenting).   The jury in this case were not instructed on an element of the offense of assault and battery by means of a dangerous weapon (to wit, pavement) causing serious bodily injury.  They were not told that, assuming the defendant was not the principal, in order to convict him as a joint venturer in the commission of the crime with which he was charged, they were required to find beyond a reasonable doubt that the defendant shared with the principal, Roberto Hilerio, the intent to use a dangerous weapon when the principal did so by hurling the victim to the pavement.  See Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009) (judge must instruct jury that conviction of crime as joint venturer requires proof beyond reasonable doubt that "the defendant knowingly participated in the commission of the crime charged . . . with the intent required for that offense").[1]  Indeed, they were told they could convict him if he merely had the intent to assault and batter,

---

[1] As the majority describes, although the jury could also have found the defendant guilty as the principal, the evidence would have supported a finding that Hilerio was the individual who threw the victim to the ground.  Thus, as the majority concludes, because there was a general verdict, we must assess the adequacy of the instructions on both possible theories of conviction, principal and joint venturer liability, since the failure to give a correct instruction as to both theories is constitutional error.  See Commonwealth v. Bolling, 462 Mass. 440, 450 (2012) (failure to properly instruct on both theories is error); Commonwealth v. Redmond, 53 Mass. App. Ct. 1, 6-7 (2001) (omitting essential element of crime in jury instruction is constitutional error).

which, the overwhelming evidence showed, he certainly did. Because no objection was made to the inadequacy of the instruction on intent, we are required to determine whether the failure to instruct the jury that they were required to find this element beyond a reasonable doubt created a substantial risk of a miscarriage of justice.[2]  Under settled law, because the evidence did not compel a finding that the defendant had the requisite intent, the error did create a substantial risk of a miscarriage of justice.  See Commonwealth v. Redmond, 53 Mass. App. Ct. 1, 8 (2001).  Because the court majority finds to the contrary only by effectively replacing the shared intent requirement for joint venturers with respect to use of a dangerous weapon with a weaker requirement that they were already "consciously acting together" with the principal, I must respectfully dissent.

When we uphold the conviction of an individual in the absence of a jury instruction on an essential element of the offense, we in effect usurp the jury's function.  An individual may be found guilty of a crime, of course, only after a finding

---

[2] The Commonwealth does not argue that the failure to object was a reasonable tactical decision of trial counsel, see Commonwealth v. Silva, 431 Mass. 401, 405 (2000) (defendant's trial strategy is relevant to substantial risk analysis), or that this was "invited error."  Commonwealth v. Knight, 37 Mass. App. Ct. 92, 99-100 & n.2 (1994) (when defendant specifically requests instruction at trial, defendant may not challenge instruction on appeal).

that each element of the offense has been proven has been made by a jury, not by a panel of appellate judges who have not heard the live testimony or deliberated about the evidence as jurors do.  And, of course, it is a bedrock principle of due process that one may not be convicted of a crime, with, among other things, the attendant loss of liberty, unless each essential element of the offense has been proven to the jury beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  When we uphold a conviction in these circumstances, by definition the jury, which has not been instructed on an element of the offense, has not explicitly found it proven beyond a reasonable doubt.

Thus, although our cases hold that not every failure to instruct on an essential element of the offense creates a substantial risk of a miscarriage of justice, in light of the fundamental nature of such an error, a substantial risk of a miscarriage of justice must be found unless the presence of that element can be "ineluctably inferred" from the evidence, Commonwealth v. Azar, 435 Mass. 675, 688 (2002) (quotation omitted), that is, unless the evidence "required the jurors to find" the essential element on which they were not instructed. Ibid.

The rule does not create a "presum[ption,]" ante at        n.9.  As in all cases of unpreserved error, the

burden to show a substantial risk of a miscarriage of justice lies with the defendant.  But the law is clear.  As Justice Grasso wrote in Commonwealth v. Redmond, 53 Mass. App. Ct. at 8, a substantial risk of a miscarriage of justice is created by failure to instruct on an element of the offense unless "the only permissible inference" from the evidence is that the element was present.  The defendant's burden in this circumstance thus is to show merely that that is not the only permissible inference.  This is what creates the requisite "uncertainty that the defendant's guilt has been fairly adjudicated," that requires reversal.  Commonwealth v. Chase, 433 Mass. 293, 299 (2001).

Thus, while viewed with a wide-angle lens it may be an "extraordinary situation" in which we find a substantial risk of a miscarriage of justice, ibid., where the judge fails to instruct the jury on an essential element of the offense -- itself, I hope an extraordinary situation --  it is an ordinary one.  Unsurprisingly, both the Supreme Judicial Court and our court conclude routinely that that such a failure has created such a risk.  Indeed, the Supreme Judicial Court has reached such a conclusion without even mentioning, let alone analyzing, the possibility that failure to instruct on an essential element of the offense might not create such a risk, see Commonwealth v. Paquette, 475 Mass. 793, 802 (2016), and we have made clear that

in at least some circumstances when a jury is not charged on, and therefore has not found, an essential element of the offense, a substantial risk of a miscarriage of justice is "inherent." Commonwealth v. Gorman, 84 Mass. App. Ct. 482, 492 (2013).

While I agree with the court majority that the evidence in this case would have supported a finding that the defendant, if he was acting as a joint venturer and not a principal, shared the intent of the principal, the evidence does not compel such a finding.

The court majority does not conclude otherwise. Instead it asks a different question, one that eliminates the shared intent requirement: whether the defendant consciously acted together with the principal throughout the assault and battery or, instead, "withdrew from the rapidly unfolding conflict before [the victim] was thrown to the pavement." Ante at      . Because this is the question it asks, the court majority then suggests that, given the other verdicts, the only way the defendant could not have had the intent required would be if he "withdrew from the . . . conflict before Downs was thrown to the pavement, then returned to kick him moments later," a most unlikely scenario.

The court majority concludes unsurprisingly that the jury's other verdicts demonstrate that the jury found the defendant did

not withdraw in this exceedingly implausible way. It concludes that "by convicting the defendant of kicking [the victim]," after he was thrown to the pavement, "the jury had to have found that [the defendant] 'consciously acted together' with Hilerio throughout the assault, including 'at the climactic moment' when [the victim] was thrown to the pavement." <u>Ante</u> at          , quoting from <u>Commonwealth</u> v. <u>Sexton</u>, 425 Mass. 146, 152 (1997). This, the majority concludes, demonstrates there was no substantial risk of a miscarriage of justice, regardless of whether the defendant actually had the intent to use a dangerous weapon at the moment when (by hypothesis) Hilerio threw the victim to the pavement.

But to convict the defendant on the joint venture theory, the jury were required, as the majority explains elsewhere in its opinion, not merely to find that the parties "consciously acted together," before and after the climactic moment, or that the defendant did not withdraw prior to it, but to find that the defendant had the intent at the moment of the principal throwing the victim to the pavement to assault and batter the victim <u>by means of a dangerous weapon</u>. Since the use of the pavement was the first use of a dangerous weapon in the assault, if Hilerio was the principal the defendant might at that moment not have had the intent to use a dangerous weapon not because he <u>withdrew</u>, but because he had <u>not yet formed the intent to use a</u>

dangerous weapon at the time when Hilerio suddenly acted.  That the defendant had acted together with Hilerio prior to this moment demonstrated only an intent to assault and batter; that the defendant had an intent to use a dangerous weapon (his shod foot) afterward suffices to support a finding that he had the requisite shared intent at the prior time when the victim was thrown to the ground, but it does not compel such a conclusion. Thus, in holding that the necessary implication of the defendant "consciously acting together" with Hilerio both before and after the victim was thrown to the pavement is that the defendant had the requisite intent to be convicted as a joint venturer for throwing the victim to the pavement, the majority reads the shared intent requirement out of its analysis.

An examination of the defendant's conviction for kicking the victim may make the point more clearly.  The majority and I agree that the critical evidence necessary to support a finding beyond a reasonable doubt that the defendant shared the requisite intent is the defendant's own assault of the victim with a dangerous weapon, his shod foot.  See ante at        . But this conduct came after the victim was thrown to the pavement, the first use of a dangerous weapon against the victim.  Whether, at the "climactic moment" when the victim was thrown to the pavement the defendant already had an intent to utilize a dangerous weapon, or instead was surprised by such use

of the pavement, and developed his own intent only afterward, is thus a question for the jury. The finding that he shared the principal's intent at that moment was neither "required" nor did the evidence make it "ineluctable." It was not the only inference the jury could have drawn. See Redmond, 53 Mass. App. Ct. at 8. Therefore the failure to instruct on intent created a substantial risk of a miscarriage of justice.

The court majority may be read to suggest that if I am correct, "assailants who participate in a group attack would be insulated from criminal liability where it is not possible to determine which one used which weapon or inflicted which injuries." Ante at      . But this conflates sufficiency of the evidence with the question of whether failure to instruct creates a substantial risk of a miscarriage of justice. Of course assailants in a group attack can be, and routinely are, convicted as joint venturers (just as, on retrial, the defendant may be convicted here), so long as a jury actually finds the assailants share the requisite intent with the principal. The evidence here (and in all such similar cases) is sufficient to support such a finding. It just does not in this case compel it. And therefore, because, and only because, the jury were erroneously instructed they did not have to find shared intent, the defendant is entitled to a new trial on this charge.

Commonwealth v. Sexton, 425 Mass. at 152, to the extent it is relevant -- the court there did not hold that the jury were required to find the requisite intent, only that there was sufficient evidence to support such a finding -- supports my analysis and my conclusion.  The Supreme Judicial Court explicitly noted there that the defendant "may not initially have had knowledge that [the principal] intended to use the pavement to effectuate the attack."  Ibid.  It stated, however, that it was "apparent" that the defendant shared the principal's intent, but only because "the defendant continuously kicked and punched [the victim] while [the principal] repeatedly slammed [the victim's] head into the pavement."  Ibid.  The critical fact that made the defendant's shared intent to use the pavement as a dangerous weapon apparent in that case was that the principal slammed the victim's head against the pavement not only before, but after the defendant himself began kicking the victim.  By contrast, the court recognized that at the time of the principal's initial use of the pavement as a dangerous weapon, the defendant, as here, may not have had sufficient knowledge to share his intent.  Ibid.

Because evidence is absent here that ineluctably requires a finding of shared intent at the climactic moment when, by hypothesis, Hilerio threw the victim to the ground, under our case law, the failure to instruct the jury properly on the

essential element of intent with respect to the one charge at issue created a substantial risk of a miscarriage of justice. Because I conclude as a consequence that there must be a new trial on this charge, I must respectfully dissent.